**In re SAN ANGELO PRO HOCKEY CLUB, INC., Debtor.**

**No. 02–60321–RLJ–11.**

United States Bankruptcy Court, N.D. Texas, San Angelo Division.

March 13, 2003.

David Weitman, Hughes and Luce, Dallas, TX, for Debtor.

Samuel S. Allen, Jackson Walker, San Angelo, TX, for City of San Angelo.

## MEMORANDUM OPINION

ROBERT L. JONES, Bankruptcy Judge.

Before the court are the issues of whether damages should be awarded to San Angelo Pro Hockey Club, Inc., the Debtor and Debtor–in–Possession (the "Debtor"), for the City of San Angelo's (City's) violation of the automatic stay (11 U.S.C. § 362) concerning the Debtor's personal property and trade fixtures, and whether certain items of property constitute personal property, trade fixtures, fixtures, or leasehold improvements. These issues were originally raised by the Debtor's motion (the "Motion") seeking an order imposing an award of damages and, alternatively, for civil contempt against the City for violation of the automatic stay. The Motion alleged that the City violated the automatic stay by (i) failing and refusing to turn over control and possession of the Debtor's leased premises at the San Angelo Coliseum; (ii) failing and refusing to turn over to the Debtor control and possession of the leasehold improvements permanently affixed to the realty; (iii) refus-

ing to allow the Debtor to exercise its right of possession and control over its personal property and trade fixtures located on the leased premises.

On an expedited setting, hearing on the Motion was held September 25, 2002. Upon request by the City, the court granted the parties until October 2, 2002, to file additional briefs on the issues presented. On October 4, 2002, the court issued its findings of fact and conclusions of law from the bench, specifically holding as follows:

1. That there was no stay violation with respect to the leasehold premises as the court found the lease was terminated prior to the bankruptcy;

2. That the City did violate the stay as to the personal property and trade fixtures owned by the Debtor as the court found that such items were property of the bankruptcy estate;

3. That the evidence was insufficient to determine the characterization of specific items of property;

4. That the issue of damages and any questions regarding characterization of specific items of property would be set on the court's November 7, 2002, San Angelo docket;

5. That the court was making no findings regarding the Debtor's rights to payments from concessions;

6. That all relief requested by either of the parties under their motions was denied.[1]

*See* Court's October 4, 2002 ruling.

Hearing on the issues of whether damages should issue and questions concerning the characterization of specific items of property was, in accordance with the court's ruling, set on the court's November

---

1. Also heard on September 25, 2002, was the City's Motion for Stay of Proceedings and Abstention filed September 20, 2002. As indi-

cated, the court denied the relief requested by the City's motion as part of its October 4, 2002, ruling.

7, 2002, docket. Upon request of the parties, the hearing was continued to December 9, 2002, and was held December 9–10 and January 13–14, 2003.

In accordance with the court's October 4, 2002 ruling, the court finds it has jurisdiction over the issues raised under 28 U.S.C. § 1334(b) and that this is a core proceeding under 28 U.S.C. § 157(b)(2) as it concerns section 362, the automatic stay; section 541, property of the estate; and addresses matters affecting the administration of the bankruptcy estate.

### Background

The court refers to its specific findings and conclusions made from the bench on October 4, 2002. A copy of the transcript of the court's October 4, 2002 ruling is attached hereto. As background, the court notes that, as evident by the Debtor's name, the Debtor, prior to the bankruptcy filing, owned and operated the San Angelo hockey team, a minor league professional hockey team that is a member of the Central Hockey League. The team played at the San Angelo Coliseum under a lease agreement between the Debtor and the City. The Debtor's rights to the team were derived from a franchise with the League. As a result of several disputes between the Debtor and the City regarding payments under the lease (both as to whether all payments were made and the timeliness of payments), the issue of whether the lease could be terminated was submitted to binding arbitration. The arbitrator held for the City, which precipitated the bankruptcy filing and the Motion. The Debtor, by the Motion, contended that the arbitration ruling was ineffective. This court, in its October 4 ruling, held that the parties were bound by the arbitration award.

The central issue properly before this court was whether the City had committed a stay violation by denying any rights to the Debtor concerning the leasehold premises and all other property associated with the leasehold (personal property, fixtures, trade fixtures, and leasehold improvements). The arbitration award addressed only the leasehold premises. A stay violation was premised upon the Debtor retaining rights in property. *See* Court's October 4, 2002 ruling at 16–17. This necessitated that the court make certain findings regarding the Debtor's rights in property. The court, having found a stay violation by the City because the Debtor retained its rights in personal property and trade fixtures, addresses first whether damages should issue for the City's stay violation. As contemplated by the court's October 4 ruling, the court will then address the characterization of specific items of property to resolve whether a stay violation occurred as to such items.

### Discussion

#### A. Damages

The Debtor's damage model reflects total damages of $155,579.08. There are ten components to the model: (1) rental of ice plant—$48,000; (2) use of the glycol coolant—$14,192.78; (3) use of the homosote—$5,000; (4) use of the goal judge boxes—$800; (5) use of the VIP parking barriers—$800; (6) damage to ice-making equipment—$1,249.99; (7) value of missing equipment—$41,272 (includes four laser lights at $35,000); (8) storage of equipment for nine months—$15,300; (9) insurance for nine months—$3,843.78; (10) interest carry on loans secured by equipment—$25,120.53. *See* Debtor's Ex. 18. The Debtor reduced its damage claim by approximately $40,000 to account for items incorrectly listed as missing or damaged (as was discovered during the course of the hearing).

124

In addition, the Debtor seeks recovery of attorney's fees for prosecuting its motion of approximately $220,000 ($179,000 through November 30, 2002, plus an additional $41,000 incurred through the January hearings). *See* Debtor's Exs. 26–30.

■ Section 362(h) provides that "[a]n *individual* injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (2002) (emphasis added). As conceded by the parties here, the Debtor, as a corporation, may not recover damages under section 362(h). *See In re Freemyer Indus. Pressure Inc.,* 281 B.R. 262, 268 (Bankr.N.D.Tex.2002) (Lynn, J.); *First RepublicBank Corp. v. NCNB Tex. Nat'l Bank (In re First RepublicBank Corp.),* 113 B.R. 277, 279 (Bankr.N.D.Tex.1989) (Felsenthal, J.).[2]

■ The court may, however, award damages to a corporate debtor in enforcement of the court's civil contempt power or pursuant to its equitable powers under section 105 of the Code. *See In re Freemyer Indus. Pressure Inc.,* 281 B.R. at 269 (court relied on its equitable power under section 105 in assessing damages); *In re First RepublicBank Corp.,* 113 B.R. at 279 (the court assessed damages for violation of stay to corporate debtor based on Rule 9020 and contempt).

Section 105 allows the court to issue orders or judgments "necessary or appropriate to carry out the provisions of . . ." the Bankruptcy Code. *In re Freemyer Indus. Pressure Inc.,* 281 B.R. at 269. The applicable provision here is section 362, the

automatic stay. An award of damages in favor of a corporate debtor may provide an incentive for debtors to prosecute violations of the stay and for creditors to observe the limits imposed by the automatic stay. *See id.* Similarly, civil contempt as a sanction may serve to insure compliance with the automatic stay or to compensate a debtor for losses or damages sustained because of a stay violation. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1555 (11th Cir.1996).

■ The Fifth Circuit has recognized that a major purpose of civil contempt is to compensate a party for damages sustained as the result of a violation of a court order or injunction. *See American Airlines Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 585 (5th Cir.2000). The automatic stay is a self-executing injunction, and therefore, for contempt purposes, constitutes an order issuing from the bankruptcy court. *See Gruntz v. County of Los Angeles,* 202 F.3d 1074, 1082 (9th Cir.2000); *In re Jove Eng'g, Inc.,* 92 F.3d at 1546.

■ As noted, section 362(h) requires a "willful" stay violation before damages will issue. Though section 362(h) is not applicable, the court, in determining whether damages should be awarded under either the court's equitable or contempt powers, begins its analysis by determining whether the City's conduct constitutes a willful violation of the stay. Willfulness within the context of an alleged stay violation is almost universally defined to mean intentional acts committed with knowledge of the bankruptcy petition. *See Fleet Mort-*

---

**2.** This appears to be a majority view. *See, e.g., Sosne v. Reinert & Duree (In re Just Brakes Corp. Sys. Inc.),* 108 F.3d 881, 884–85 (8th Cir.1997); *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1550 (11th Cir.1996); *Johnston Envtl. Corp. v. Knight (In*

*re Goodman),* 991 F.2d 613, 619 (9th Cir. 1993); *Maritime Asbestosis Legal Clinic v. LTV Steel Co. Inc. (In re Chateaugay Corp.),* 920 F.2d 183, 186–87 (2d Cir.1990). *But see Budget Serv. Co. v. Better Homes of Va. Inc.,* 804 F.2d 289, 292 (4th Cir.1986).

gage Group, Inc. v. Kaneb, 196 F.3d 265, 269–70 (1st Cir.1999); Citizens Bank of Md. v. Strumpf (In re Strumpf), 37 F.3d at 155, 159 (4th Cir.1994), rev'd on other grounds, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); Price v. United States (In re Price), 42 F.3d 1068, 1071 (7th Cir.1994); Lansdale Family Rests. Inc. v. Weis Food Serv. (In re Lansdale Family Rests. Inc.), 977 F.2d 826, 829 (3d Cir. 1992); Nissan Motor Acceptance Corp. v. Baker, 239 B.R. 484, 488 (N.D.Tex.1999).

 Specific intent to violate the stay is not required for section 362(h) relief. See Lansdale Family Rests. Inc., 977 F.2d at 829; Nissan Motor Acceptance Corp., 239 B.R. at 488. Only the acts which violate the stay need be intentionally committed. See In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1104–5 (2d Cir.1990)

(defining wilfulness as a deliberate act); Lansdale Family Rests. Inc., 977 F.2d at 829. "A willful violation of the automatic stay provision is committed when the contemnor acts with knowledge of the filing of the bankruptcy petition." In re Meinke, Peterson & Damer, 44 B.R. 105, 108 (Bankr.N.D.Tex.1984) (Ford, J.). A creditor's good faith belief that he is not violating the stay is not determinative of the willfulness issue. See id. See also Coats v. Vawter (In re Coats), 168 B.R. 159, 168 (Bankr.S.D.Tex.1993).

The willfulness issue becomes more problematic where there is a legal uncertainty whether the stay applies or not to the creditor's conduct. See University Med. Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d 1065 (3d Cir.1992); U.S. v. Inslaw Inc., 932 F.2d 1467 (D.C.Cir.1991).[3]

**3.** In Inslaw, the D.C. Circuit found that the government's continuing use of intangible enhancements to a software program developed by the debtor was not a stay violation. Inslaw Inc., 932 F.2d at 1472. The court stated that the government held a copy of the enhanced software under a claim of ownership and that Inslaw, the debtor, held no possessory interest in the software enhancements at the time the bankruptcy was filed. The court, in reversing the bankruptcy court, stated that the bankruptcy court identified the relevant property as Inslaw's intangible trade-secret rights in the software. See id. It commented that the bankruptcy court had found that the government's continuing use of these intangible enhancements was an "exercise of control" or property of the bankruptcy estate. Id. The court then stated as follows:

> If the bankruptcy court's idea of the scope of "exercise of control" were correct, the sweep of § 362(a) would be extraordinary-with a concomitant expansion of the jurisdiction of the bankruptcy court. Whenever a party against whom the bankrupt holds a cause of action (or other intangible property right) acted in accord with his view of the dispute rather than that of the debtor-in-possession or bankruptcy trustee, he would risk a determination by a bankruptcy court that he had "exercised control" over

intangible rights (property) of the estate. In making that determination (one way or the other), the bankruptcy court would be exercising its "core" jurisdiction over the dispute, subject to review by an Article III court on fact issues only under the deferential "clearly erroneous" standard. See 28 U.S.C. § 158; Bankruptcy Rule 8013; 1 King, Collier on Bankruptcy ¶ 3.03[7]; see also 28 U.S.C. § 157(b) (1988) (identifying "core" proceedings): Budget Service Co. v. Better Homes of Virginia, Inc., 804 F.2d 289, 292 (4th Cir.1986) (automatic stay violations are within the core).

> . . . .

> Under this view, it does not matter whether the Department has possession of the PROMIS enhancements under a claim of outright title, as they do, or under a more limited lease or license. In both situations, a party in possession of an asset in which the bankrupt has an interest would violate § 362(a) by any act inconsistent with the bankrupt's claims as determined by the bankruptcy court. As a result, a wide range of disputes, such as a bankrupt lessor's claims against a lessee, or a bankrupt co-owner's claims against other holders of concurrent property interests, would slide into bankruptcy court.

Id. at 1472 & n. 90.

This is best illustrated by the Third Circuit's holding in *Sullivan.*

In *Sullivan,* the Chapter 11 debtor, University Medical Center, was a Medicare provider. *Sullivan,* 973 F.2d at 1069–70. The Department of Health and Human Services (HHS) withheld payments due for postpetition services on the basis of overpayment for prepetition services. *See id.* at 1071. The bankruptcy court held that HHS's withholding of the payment violated the automatic stay and awarded attorney's fees and prejudgment interest. *See id.* After disposition through the district court, which affirmed in part and reversed in part, the court of appeals addressed the question of whether HHS's violation constituted a willful stay violation. *Id.* at 1071–72. The court held that HHS's conduct was not willful and thus the debtor was not entitled to attorney's fees and prejudgment interest. *Id.* at 1088–89.

In the court's analysis, the court recognized the definition of willfulness from its prior opinion. *See id.* at 1088 (quoting *Cuffee v. Atlantic Bus. & Cmty. Corp. (In re Atlantic Bus. & Cmty. Corp.),* 901 F.2d 325, 329 (3d Cir.1990)). There, the Third Circuit defined willful as follows:

> A 'willful violation' does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

*In re Atlantic Bus. & Cmty. Corp.,* 901 F.2d at 329 (quoting *Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989) [quoting *INSLAW, Inc. v. United States (In re INSLAW Inc.),* 83 B.R. 89, 165 (Bankr.D.D.C.1988)] ). The court

revisited the facts of *Atlantic Business* and recognized that the creditor's conduct in *Atlantic Business* was far more egregious than that of HHS. *See Sullivan,* 973 F.2d at 1087. Specifically, the creditor in *Atlantic Business* not only violated the stay but also defied specific court orders directed to the creditor. *See id.* HHS acted through the Secretary of Health and Human Services. The court acknowledged that the Secretary's good faith belief that he was not violating the stay was insufficient under *Atlantic Business* to escape liability. *See id.* at 1088. However, the court recognized that

> the Secretary also had persuasive legal authority which supported his position. For this reason we conclude that the withholding by HHS did not fall within the parameters of 'willfulness' as such actions have been described in *Atlantic Business* and that the Secretary should not be penalized for the position he took toward UMC after the filing of the petition.

*Id.* The court further noted that "the law regarding the application of the stay to the Department's actions was sufficiently uncertain that HHS reasonably could have believed its actions to be in accord with the stay." *Id.*

■ As in *Sullivan,* the City, from an objective viewpoint, had a reasonable good faith belief that termination of the lease caused the personal property and trade fixtures to revert to the City. The City's reading of the lease was reasonable and defensible. The court found for the Debtor: the lease was ambiguous and such ambiguity was construed, in accordance with Texas law, to avoid a forfeiture. *See* Court's October 4, 2002 ruling. The court therefore held that the Debtor retained the personal property and trade fixtures. Until the court's ruling on October 4, 2002, ownership of the personal property and

trade fixtures was legally uncertain and thus so was the question of whether the stay was violated. The City committed a technical stay violation; it did not commit a willful violation.

Having found the City did not commit a willful violation of the stay, should the court award damages, regardless?

 The court recognizes that a finding of willfulness is not necessarily a prerequisite to damages for contempt. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499 (1949); *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1555 (11th Cir.1996). *But see In re Crysen/Montenay Energy Co. v. Esselen Assocs. Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1104–05 (2d Cir.1990).[4] However, based upon several factors in this case, the court is convinced that an award of damages under either the court's contempt or equitable powers is inappropriate.

First, before the court will assess damages for contempt, the court must be convinced that the alleged contemnor is, at a minimum, sufficiently on notice that his conduct violates a court order. Such notice is less routine when the order at issue is, in effect, the imposition of a statutory provision (section 362) that applies to the world in general.

Second, as noted with respect to the "willfulness" discussion, an objective, bona fide dispute existed concerning whether the personal property and trade fixtures were property of the bankruptcy estate.

Third, the City's conduct cannot be faulted here. The Debtor filed this Chapter 11 case on August 7, 2002. By letter dated that same date, Debtor's counsel advised the City of the filing and that the City's continued "exercise of control over the Debtor's property" would constitute a stay violation. *See* Debtor's Ex. 6. By letter dated August 19, 2002, Debtor's counsel reiterated what had been stated in the August 7 letter, and that the City's conduct "may result in the Debtor seeking a determination that the City should be held in contempt of court . . . ." *See* Debtor's Ex. 7. The August 19 letter emphasized that any actions by the City to terminate the lease were ineffective and thus the lease was "property of the Debtor's estate within the meaning of 11 U.S.C. § 541." *See id.* The letter further stated that the Debtor was entitled to possession of the leasehold premises, was the owner of its trade fixtures, and that the Debtor intended to reorganize. *See id.* Finally, the letter stated that Debtor's counsel was drafting a motion to seek redress for the City's stay violation. *See id.* The City was therefore on notice of the bankruptcy filing and the Debtor's intent to reorganize. The City's failure to affirmatively request the court's determination of whether it was justified in its position, i.e. whether it was engaging in a stay violation, is excused under the circumstances. The City obviously disagreed with the Debtor's position. In addition to the letter, City's counsel was in contact with Debtor's counsel and knew that Debtor was filing its motion triggering the issues raised and would seek an expedited hearing. The City was certainly aware that

---

4. In *Crysen/Montenay,* the Second Circuit decided the case under section 362(h) and therefore addressed the meaning of a "willful" stay violation. *In re Crysen/Montenay Energy Co.,* 902 F.2d at 1104–05. However, the court noted that prior to the 1984 enactment of subsection (h) of section 362, sanctions for stay violations were imposed pursuant to the court's contempt powers, which required a finding of malicious conduct; a good faith argument and belief that the questioned conduct did not violate the stay would also avoid a contempt finding. *See id.* at 1104.

the hockey season was about to begin and that both parties needed a resolution. The issues raised were extensive and complex. Despite this, the City cooperated fully and caused no delays in consideration of the matter. As a result, the matter was heard as expeditiously and efficiently as could be expected under the circumstances.

The City cooperated fully after the October 4 ruling, as well. The City worked with the Debtor's representatives in having the trade fixtures and personal property removed. The City incurred expenses in having certain items removed itself. It removed the dasher boards on October 11 and stored them numerically in a safe place. The ice resurfacers were parked and covered. The City accounted for the laser lights that the Debtor had alleged were missing. While the Debtor's recovery of the property was not seamless, it was also without incident. In short, any claim of damages for the City's conduct after October 4 is unfounded.

Fourth, the Debtor failed to prove it was actually damaged by the stay violation.[5] In this regard, Scott Moore, the Debtor's vice president and director of hockey operations, testified that the value of the trade fixtures and personalty would be maximized by selling them as a whole and offering them for sale during the prime selling season of July through August. He testified that the Debtor's damages should reflect this lost opportunity. He also testified that the Debtor's objective from the outset was to sell the trade fixtures and personalty. He apparently felt a need to so testify as his claim of damages based upon the lost opportunity is premised upon the Debtor's intention to sell the personal property and trade fixtures at the time the bankruptcy was filed. This testimony is ultimately self-serving and unconvincing.

A review of the Motion, the Debtor's briefs filed in support of the Motion, the evidence submitted at the September 25, 2002, hearing, and counsel's time records introduced at the present hearing, reflects that the Debtor's overriding objective in filing the bankruptcy and initiating the Motion was to reinstate the lease and the franchise. Richard Moore, Scott Moore's father, and the principal and president of the Debtor, admitted as much during his testimony at the present hearing. Mr. Moore obviously has a large investment in the Debtor and considered an ongoing operation as the best means to recover a portion if not all of his investment. A sale of the franchise, as opposed to specific assets, was also a possibility. Removal of the trade fixtures and personal property for purposes of a sale of such items during August and September, 2002, would have rendered this objective impossible.

It would be unfair to deny damages solely on the basis that, at the September 25 hearing, the Debtor's argument centered on the lease termination issue. The court recognizes that the Debtor's theory was that the lease termination created a domino effect—cancellation of the franchise and possible loss of all the Debtor's leasehold improvements, trade fixtures, and personal property. The City, likewise, took an all or nothing approach—lease termination triggered lease provisions that caused the leasehold improvements, trade fixtures, and personal property to revert to the City. However, to contend that the Debtor is entitled to damages based on the Debtor's inability to sell the personal property and trade fixtures, when the Debtor had no actual intent to sell the personal property and trade fixtures, is disingenuous. At most, the Debtor was denied access to the personal property and trade

**5.** The court's conclusion that the Debtor failed to prove damages resolves this case in the City's favor, regardless whether the stay violation was willful or not.

fixtures from the time of the filing until the October 4, 2002 ruling. The City maintained the personal property and trade fixtures and made the Coliseum hockey-ready during this interim and thus, very likely, enhanced the value of the personal property and trade fixtures.

The evidence does not establish that the City damaged, destroyed, or concealed any of the personal property or trade fixtures. The Debtor did not experience a loss of income occasioned by the City's retention of control of the property. Any loss of income resulted from the City's termination of the lease which, as the court previously held, did not constitute a stay violation. There is certainly support in the law that a debtor may recover, as actual damages, rental costs for property unlawfully withheld from the debtor by the stay violator. *See In re Jackson*, 251 B.R. 597, 601–02 (Bankr.D.Utah 2000); *In re Zaber*, 223 B.R. 102, 107 (Bankr.N.D.Tex.1998); *Brooks v. World Omni (In re Brooks)*, 207 B.R. 738, 742 (Bankr.N.D.Fla.1997). In such cases, however, rental costs represented the funds that the debtor expended, or would have had to expend, to replace the withheld property during the period that such property was withheld in violation of the stay. *See id.* The court has found no support in the law for the proposition that a debtor may recover rental costs from a stay violator as measured by the violator's use of the estate's property.

 Finally, a debtor may recover its reasonable expenses incurred in physically recovering the withheld property, if the creditor does not reasonably return such property to the debtor at its own expense. *See, e.g., In re Brooks*, 207 B.R. at 742; *Beair v. Polhamus (In re Beair)*, 168 B.R. 633, 637 (Bankr.N.D.Ohio 1994). However, as the Debtor would have had to remove its equipment from the arena anyway, following the termination of the lease, the Debtor has not incurred any removal expenses as a *result* of the City's stay violation.

Given the facts and circumstances of this case, the court will not impose a standard that imposes liability for conduct that is something less than willful. It is not necessary or appropriate in this case to assess damages as a means to vindicate the provisions of section 362 of the Code. The Code and its policies will survive conduct such as the City's here.

Attorney's fees as an element of damages are denied. The stay violation was not willful; the Debtor incurred no actual damages. An award of attorney's fees would be improper. *See, e.g., In re Hill*, 19 B.R. 375, 379–80 (Bankr.N.D.Tex.1982).

### B. *Characterization of Property*

The court, in its October 4, 2002 ruling, held that the Debtor retains its personal property and trade fixtures. The court determined that the evidence was insufficient to allow the court to make any decision regarding the characterization of specific items of property. The court did, however, define a trade fixture "as an item that can be removed without material alteration or permanent injury to the freehold and which the tenant annexes to realty to enable the tenant to carry on its business, trade, or profession." *See* Court's October 4 ruling at 23. *See also Reames v. Hawthorne–Seving Inc.*, 949 S.W.2d 758, 761 (Tex.App.—Dallas 1997, writ denied); *Neely v. Jacobs*, 673 S.W.2d 705, 707 (Tex.App.—Fort Worth 1984, no writ); *Connelly v. Art & Gary Inc.*, 630 S.W.2d 514, 515 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

The City, relying on the Texas Supreme Court case of *Logan v. Mullis*, 686 S.W.2d 605 (Tex.1985), argues that the characterization of certain items of property as a

fixture resolves the ownership in the City's favor. The court, however, draws a distinction between a fixture and a trade fixture.

The *Logan* case set forth the three factors to consider in determining "whether personalty has become a fixture, that is, a permanent part of the realty to which it is affixed: (1) the mode and sufficiency of annexation, either real or constructive; (2) the adaptation of the article to the use or purpose of the realty; and (3) the intention of the party who annexed the chattel to the realty." *Logan*, 686 S.W.2d at 607–08. The third factor dealing with intent is preeminent, while the first and second factors constitute evidence of such intent. *See id.* Intent is made apparent by objective manifestations. *See id.* Thus, the above forms the test for determining whether an item of personality becomes a fixture. *See id.*

While a trade fixture is similar to a fixture, in the sense that a trade fixture is an item of personality that has been annexed, a trade fixture is "to be distinguished from other fixtures attached to the property." *Jim Walter Window Components v. Turnpike Distribution Ctr.*, 642 S.W.2d 3, 5 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). Texas case law treats trade fixtures as a subset, or a special type, of fixtures—in order for an article of personalty to be a trade fixture, it must first be a fixture generally. *See id. See also Moskowitz v. Calloway*, 178 S.W.2d 878, 880 (Tex.Civ.App.—Texarkana 1944, writ ref'd w.o.m.) (discussing how trade fixture is a type of fixture, and if personalty claimed to be trade fixture is not removable without material alteration or permanent injury, such personalty is a general fixture); *Nine Hundred Main Inc. v. City of Houston*, 150 S.W.2d 468, 471 (Tex.Civ.App.—Galveston 1941, writ dism'd judgm't cor.) ("That there exists in the same and similar business relationships such a distinction between 'alterations, additions, or improvements,' and 'fixtures,' is recognized quite generally by the authorities, especially those in Texas. Such 'fixtures' as these parties thus appear to have mutually had in mind are classified in Texas as 'trade fixtures,' 'agricultural fixtures,' and fixtures established for ornament, convenience, or domestic use, hence are removable on termination of the lease, if that can be effected without substantial injury to the freehold").

In addition to the three-factor test for determining whether an item of personality becomes a fixture, therefore, an article of personality is a trade fixture if three additional elements are met: the article must be annexed in the context of a lease; the article must be annexed by the tenant to enable the tenant to carry on its business; and the article must be removable without material alteration or permanent injury to the freehold. *See id.* If these three elements are met, the article is not treated as a general fixture, but is instead treated as a trade fixture.

With the foregoing analysis in mind, the court will address certain items of property that were raised by the parties during the trial of this matter.

### Ice Resurfacers, Goal Judge Boxes, Homosote, and VIP Parking

The ice resurfacers, the goal judge boxes, the homosote, and the materials making up the VIP parking constitute personal property. These items are not attached to the realty. Without annexation, they are neither improvements nor fixtures. *See, e.g., Gawerc v. Montgomery County*, 47 S.W.3d 840, 842 (Tex. App.—Beaumont 2001, pet. denied) ("both an improvement and a fixture require annexation to realty, and until something is

annexed to realty, it is neither an improvement nor a fixture").

*Dasher Boards, Plexiglass, Shot Clocks, and Laser Lights*

 Debtor installed each of these items for the operation of its business. The evidence established that each of these items was, at most, connected to the realty by bolts, screws, gravity, or friction. Even assuming that these items were annexed to the realty, the evidence further established that each of these items was removed with no alteration or injury to the realty. Thus the definition of trade fixture is met with respect to each of these items. Additionally, there appears to be no real argument that these items were anything other than trade fixtures.

*Ice Floor*

 The evidence established that the ice floor consists of several miles of pipe buried under a thin layer of special concrete. The coolant, Glycol, is cooled to below freezing temperature and flows through the pipe, cooling the layer of concrete to below freezing, thereby freezing water on the surface of the ice floor once the floor is flooded with a thin layer of water. The removal of the ice floor would require jack-hammering out tons of concrete, followed by removal of the pipes, followed by poring and resurfacing a new layer of concrete. Removal of the ice floor, therefore, cannot be accomplished without major demolishing and rebuilding. Additionally, the ice floor was never an article of personalty—it was always an integral, permanent, and irremovable part of the arena. Thus, the ice floor is an improvement, to which the City gained title upon installation.

*Glycol*

 The evidence established that many gallons of Glycol flow through the pipes under the ice floor. The Glycol is cooled by the ice plant to temperatures below freezing. Whether in use or not in use, the Glycol rests in the pipes under the ice floor; the ice plant merely circulates and cools the Glycol. While it is uncontested that the Glycol may be removed from the pipes by blowing compressed air through one end of the pipes and collecting the Glycol in barrels at the other end, it is illogical to argue that the Glycol is personalty or a trade fixture. The Glycol is an integral component part of the ice floor which, as previously noted, is an improvement.

The ice floor is composed of more than its two-dimensional surface. It consists of the surface, the concrete, the piping, and the Glycol. Removing the Glycol from the ice floor renders the ice floor inoperable, and no longer an ice floor. To argue that the Glycol is a trade fixture is to argue that the oil in an engine, or the Freon in an air conditioning compressor, is something other than an integral part of the machine which depends on it. When one purchases a refrigerator, he certainly expects such refrigerator to come with Freon already in its compressor. Similarly, when the parties contemplated the idea of an ice floor, they necessarily included within that idea not only such items as concrete and pipes, but also coolant. This argument can be taken to extremes: if the Glycol is an integral part of the ice floor, then why aren't the ice resurfacers integral parts of the ice floor, since the ice floor requires both to function as an ice floor? The difference, however, is that the Glycol rests in the ice floor. The Glycol is an internal part of an improvement, as opposed to some external part on which such improvement relies. The Glycol, therefore, is not a trade fixture or an item of personalty.

*Metal Shed*

 Debtor argues that the metal shed erected to house the ice plant is a trade fixture. The shed sits on a slab of concrete, a few feet from the arena. The shed is welded to anchors embedded in the concrete. Debtor argues that the shed could be easily cut from the anchors, the concrete dug up, resulting in the same condition of the premises as existed before the lease. Debtor points to the fact that the dirt remaining after removal of the shed and slab would be the same dirt that existed in the same location prior to the lease.

 However, with respect to the metal shed, Debtor runs into a problem not present with other articles, because the metal shed has been annexed to the soil. An improvement includes an item which, "in contemplation of law, [is] annexed to the soil." *Big West Oil Co. v. Willborn Bros. Co.*, 836 S.W.2d 800, 802 (Tex.App.—Amarillo 1992, no writ). Thus, when an item is annexed to the soil, as opposed to a wall, floor, or ceiling, the appropriate legal analysis is not to look at such item as a fixture or as a trade fixture, but as an improvement. "The general rule is that permanent annexation to the soil of a thing in itself personal makes it a part of realty." *Cantu v. Harris*, 660 S.W.2d 638, 640 (Tex.App.—Corpus Christi 1983, no writ), *citing Missouri Pac. Ry. Co. v. Cullers*, 81 Tex. 382, 17 S.W. 19, 22 (1891). *Accord Griggs v. Magnolia Petroleum Co.*, 319 S.W.2d 818, 820 (Tex.Civ.App.—Amarillo 1958, no writ). A building permanently attached to a concrete slab or foundation is annexed to the soil. *See Cantu*, 660 S.W.2d at 640; *Griggs*, 319 S.W.2d at 820. In the absence of a contractual provision to the contrary, or an objective intent not to make the building a permanent part of the soil, such building is an improvement—it ceases to be personalty or a trade fixture. *See Cantu*, 660 S.W.2d at 640–41 (finding

that metal building attached to concrete slab was not an improvement or fixture because plaintiff failed to prove that building was permanently attached to realty).

In the present case, the metal shed was permanently attached to the concrete slab with welds. The shed was not held on to the slab merely by force of gravity, or by bolts. While a weld may be cut, such cut is a destruction; it is not merely a separation of two separate parts. Thus, the metal shed was permanently attached to the concrete slab, meaning that the shed was permanently annexed to the soil. As such, the shed is an improvement. No evidence of objective intent was offered to prove that the parties intended that the shed be anything other than permanently attached to the concrete slab. *See Griggs*, 319 S.W.2d at 819 ("it is well established in this state that a building or other construction erected and attached upon land so as to make it a permanent fixture becomes a part of the freehold in the absence of any intention or agreement on the part of the interested parties that such building should not become permanently annexed to the soil"). With nothing in the evidence to the contrary, the shed—as an improvement—is the City's property.

*Ice Plant*

 Characterization of the ice plant presents the most difficult question. The court concludes that the ice plant is a trade fixture. The ice plant meets the definition of trade fixture. In this context, the size of the ice plant is not determinative. Nor is evidence to the effect that Debtor intended for the ice plant to be a permanent part of the realty. What is determinative is that the ice plant was removed from the shed with minimal alteration or injury, if any. Pipes were cut and capped, as were electrical lines.

It may be argued that the ice plant, like the Glycol, is an integral part of the ice

floor, which is an improvement. If the ice plant is an integral part or component of the ice floor, inasmuch as the ice floor is not an ice floor without its ability to make ice, the ice plant is not a trade fixture. However, the ice floor is fully capable of functioning as an ice floor without Debtor's ice plant, if a different tenant hooks up his own ice plant. A temporary ice plant was in fact used here after the Debtor removed the ice plant. Thus, the ice plant is not an integral component part of the floor; unlike the Glycol, it is external to the floor.

### *Conclusion*

The court denies the City's request for damages and attorney's fees arising from the City's violation of the automatic stay. In addition, the court finds that the ice resurfacing machines, the goal judge boxes, the homosote, and the materials associated with the VIP parking constitute personal property and therefore belong to the Debtor. The dasher boards, plexiglass, shot clocks, and laser lights constitute trade fixtures that are removable without damage to the realty. The ice floor and the metal shed constitute improvements belonging to the City. In this regard, the court concludes that Glycol is an integral component of the ice floor and thus is neither a trade fixture nor an item of personalty. It therefore belongs to the City. Finally, the ice plant constitutes a trade fixture removable by the Debtor.