[Cite as *Wells Fargo Bank, N.A. v. TIC Acropolis, L.L.C.*, 2016-Ohio-142.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

WELLS FARGO BANK, N.A., et al.          :

     Plaintiff-Appellee          :    C.A. CASE NO. 2015-CA-32,
                                   :               2015-CA-33

v.          :    T.C. NO. 13CV938
          :

TIC ACROPOLIS, LLC, et al.          :    (Civil Appeal from
                                     :     Common Pleas Court)

     Defendants-Appellants          :
          :
          :
          :

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___15th___ day of ____January____, 2016.

. . . . . . . . . . .

VICTORIA E. POWERS, Atty. Reg. No. 0054589, 250 West Street, Columbus, Ohio 43215
    Attorney for Plaintiff-Appellee

JAMES H. GREER, Atty. Reg. No. 0046555 and PHILIP M. BORGER, Atty. Reg. No. 0084986, 400 PNC Center, 6 N. Main Street, Dayton, Ohio 45402
    Attorneys for Defendants-Appellants TIC Acropolis, LLC and TIC Properties Management, LLC

TERRY D. BORK, Atty. Reg. No. 0002284, 1649 Atlantic Blvd., Suite 200, Jacksonville, Florida 32207
    Attorney for Defendant-Appellant TIC Borrowers

. . . . . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}** TIC Acropolis, LLC, TIC Properties Management, LLC, and 28 additional

entities that own the property at issue appeal from a judgment of the Greene County Court of Common Pleas, which, after motions for summary judgment, granted a judgment and decree of foreclosure in favor of Wells Fargo Bank, N.A., trustee for the noteholder.   For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings.

## I. Factual and Procedural History

{¶ 2} This action concerns a commercial loan regarding an investment property, known as the Acropolis at Fairfield Commons, consisting of 10 condominiums in seven buildings.   The borrowers allegedly defaulted on the loan, mortgage, and associated loan agreements, resulting in the trial court's granting of a judgment and decree of foreclosure in favor of the lender.

{¶ 3} A discussion of the corporate structure and relationship among the parties is critical to an understanding of the issues on appeal.

{¶ 4} In June 2006, TIC Acropolis was formed as a limited liability company in the State of Delaware with the purpose of purchasing and syndicating the Acropolis at Fairfield Commons in Greene County, Ohio.   (Boyd Aff., Doc. #113, Ex. A, ¶ 2, ¶ 3.)   Its sole member was TIC Properties, LLC.   As a syndicator, TIC Acropolis solicited and arranged for investors/buyers to become the ultimate owners of the property.   (Boyd Aff., Doc. #113, Ex. A, at ¶ 4.)

{¶ 5} TIC Acropolis was established as a "special purpose entity" (SPE), in which TIC Acropolis's activities were limited to owning the real estate at issue.   The benefits of a special purpose entity include, among other things, linking and limiting the debt obligation to a particular asset (in this case, the Acropolis at Fairfield Commons) and

bankruptcy remoteness.

{¶ 6} In August 2006, TIC Acropolis borrowed $26.8 million from LaSalle Bank N.A. in connection with its purchase of the Acropolis at Fairfield Commons in Greene County. TIC Acropolis executed a promissory note, and the loan was secured by a mortgage and an assignment of leases and rents. TIC Acropolis and LaSalle also entered into an associated Loan Agreement, dated August 10, 2006, which required, among other things, that TIC Acropolis continue to exist as a special purpose entity and not seek dissolution. (Loan Agreement, § 4.1.30) The Loan Agreement also required the establishment and maintenance of several reserve funds, including a Repair Fund, Tax and Insurance Escrow Fund, Replacement Reserve Fund, Rollover Reserve Fund, Excess Cash Reserve Fund, and Spectral Systems Rollover Reserve.

{¶ 7} In general, the loan was a non-recourse loan, meaning that, in the event of default, the lender's (LaSalle's) remedy was limited to seizing the collateral and it could not go after the borrower (TIC Acropolis) for any deficiency. However, the Loan Agreement provided that the debt "shall be fully recourse to Borrower" if the borrower ceased to be a special purpose entity. (Loan Agreement, § 9.4.)

{¶ 8} LaSalle subsequently executed an allonge, purporting to negotiate the note to Wells Fargo, as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corporation, Commercial Mortgage Pass-Through Certificates. The allonge was attached to the note by a paper clip. On September 22, 2006, LaSalle also executed, as assignor, an assignment of the mortgage and of the assignment of rents agreement, with Wells Fargo as the assignee; the document was recorded in the Greene County Recorder's Office. Effective September 29, 2006, LaSalle also executed

an Omnibus Assignment, assigning to Wells Fargo all of its interests, rights, and title to the TIC Acropolis loan.

{¶ 9} Between 2006 and 2008, TIC Acropolis conveyed portions of its ownership interest in the property to 28 different SPE entities, collectively the "TIC Borrowers," who now own an undivided interest in the entire property as tenants in common. As part of the purchases, the TIC Borrowers entered into assumption agreements and assumed TIC Acropolis's obligations as the borrower under the original loan documents.

{¶ 10} In conjunction with the closings of the TIC Borrowers' purchases of their ownership interests in the property and their assumption of the loan from TIC Acropolis, the TIC Borrowers established an Owner's Equity Reserve Fund, commonly called TIC Held Reserve. (Kaltenbach Aff., Doc. #151, Ex. A, ¶ 3.) The fund was established with $846,304.63 in funds from the respective TIC Borrowers "with the purpose of having available equity to pay for expenses associated with the Real Property and was in addition to the reserves required by the lender under the Loan." (*Id.*) The account appeared as an asset on the TIC Borrower's quarterly and annual operating statements submitted to Wells Fargo. (*Id.*; Kaltenbach Aff., Doc. #169, Ex. B, ¶ 3)

{¶ 11} Acropolis at Fairfield Commons is managed by TIC Properties Management, pursuant to a separate agreement between TIC Acropolis, the TIC Borrowers, and TIC Properties Management. Among other responsibilities, TIC Properties Management managed the TIC Held Reserve fund as an agent for the TIC Borrowers. (*Id.*)

{¶ 12} On November 5, 2008, after it no longer had any ownership in Acropolis at Fairfield Commons, TIC Acropolis filed a Certificate of Cancellation with the Delaware

Secretary of State.

{¶ 13} In 2012, Wells Fargo and the TIC Borrowers entered into a Cash Management Agreement and a Clearing House Agreement (collectively, "the Lockbox Agreements"). The Clearing House Agreement provided that all rents, as defined by the Loan Agreement, would be deposited directly into a Clearing Account, controlled by Wells Fargo (Lender). Under the Cash Management Agreement, all rents deposited into the Clearing Account would be swept daily into a Cash Management Account. Subaccounts for the reserve funds required under Section 7 of the Loan Agreement and for other amounts required to be deposited with Wells Fargo under Section 3 of the Loan Agreement were required to be maintained on a ledger-entry basis. Section 3.3 of the Cash Management Agreement set forth the order of priority that funds would be applied to the various subaccounts. TIC Acropolis was not a party to the Lockbox Agreements and was referred to in those documents as the "Original Borrower."

{¶ 14} On August 20, 2013, Wells Fargo sent a notice of default to TIC Acropolis, the TIC Borrowers, and TIC Properties Management, notifying them that TIC Acropolis and the TIC Borrowers had defaulted on the Loan Documents by failing "to timely and properly pay all amounts required by the Loan Documents." The notice demanded payment of the amount due by August 30, 2013, and indicated that the failure to pay that amount would result in acceleration of the note.

{¶ 15} On October 4, 2013, TIC Acropolis filed a Certificate of Correction with the Delaware Secretary of State, stating that the Certificate of Cancellation filed on November 5, 2008, had been filed in error.

{¶ 16} In November 2013, Wells Fargo sent an acceleration letter, stating that it

had accelerated the note and that the entire unpaid principal and interest balance and other amounts owing were due immediately.

{¶ 17} In December 2013, Wells Fargo brought an action against TIC Acropolis, the TIC Borrowers, TIC Properties Management, the condominium unit owners association, and the Greene County Treasurer, seeking a monetary judgment and decree of foreclosure. Wells Fargo claimed that the loan documents had been breached in four respects: (1) failure to make monthly principal and interest payments; (2) failure to fund the reserve account for tax and insurance; (3) failure to fund the replacement reserve fund; and (4) TIC Acropolis failed to maintain itself as a special purpose entity. The parties filed answers to Wells Fargo's complaint.

{¶ 18} The parties subsequently filed cross-motions for summary judgment. Wells Fargo's summary judgment motion raised an additional alleged breach of the Loan Agreement, which it stated was based on the TIC Borrowers' responses to written discovery requests. Wells Fargo asserted that the TIC Borrowers committed misconduct through the misapplication or conversion of rents after an event of default.

{¶ 19} The trial court granted summary judgment to Wells Fargo and entered a judgment and decree of foreclosure in its favor, finding, in part, that:

- LaSalle negotiated the note to Wells Fargo, by means of an allonge, prior to the commencement of the action; the mortgage and assignment of rents was also assigned to Wells Fargo. Wells Fargo has the right to enforce the note, mortgage, and assignment of rents.

- "Borrower" (meaning TIC Acropolis and the TIC Borrowers) is in default under the loan documents for, among other things, failure to make monthly payments of

principal and interest when due, failure to fund the tax and insurance escrow accounts, failure to fund the Replacement Reserve Fund, and TIC Acropolis's termination of its existence as a limited liability company under the laws of the State of Delaware.

- TIC Acropolis's termination of its existence as an LLC triggers full recourse under the Loan Documents against Borrower.

- As of November 7, 2014, a total of $29,825,767.44, plus daily interest of $7,905.89, is due and payable under the note. Specifically, the trial court found that the Borrowers owed: (1) $25,330,358.47 in principal; (2) $2,722,111.04 in interest; (3) $2,658,320.69 in prepayment premium; and (4) $177,635.60 in late charges, advances, interest on advances, and processing and document preparation fees. The court subtracted $1,062,658.36 for funds on hand, including reserves.

- Wells Fargo is entitled to attorneys' fees and costs in enforcing its rights under the Loan Documents, plus additional costs, expenses and attorneys' fees incurred through the confirmation of sale. Through October 31, 2014, Wells Fargo had incurred $236,678.50 in attorneys' fees and $18,771.69 in costs.

The trial court did not make any specific findings as to Wells Fargo's allegation, raised in its summary judgment motion, that the TIC Borrowers committed misconduct through the misapplication or conversion of rents after an event of default.

**{¶ 20}** The trial court entered judgment against "each Borrower" for the note balance, including daily interest and all other costs, expenses, and reasonable attorneys' fees. The trial court ordered that the mortgage be foreclosed and the property sold. The court further granted Wells Fargo a deficiency judgment against each Borrower for

all amounts due and owing on the judgment which remain unsatisfied from the proceeds of a judicial sale. The court also authorized Wells Fargo to take possession of and sell the personal property, pursuant to its security interest in that property.

{¶ 21} TIC Acropolis, TIC Properties Management, and the TIC Borrowers appeal from the trial court's judgment.

{¶ 22} In a joint appellate brief, TIC Acropolis and TIC Properties Management claim that the trial court erred in granting summary judgment to Wells Fargo because (1) TIC Acropolis did not terminate its existence as a limited liability company, (2) even if it did terminate its existence as a limited liability company, TIC Acropolis had no continuing obligation to maintain its existence as an LLC, (3) Wells Fargo could not establish a theory of damages and such an outcome would fundamentally undermine the nature of commercial mortgage-backed securities (CMBS) financing, and (4) the funds transferred were not "rents" and thus did not trigger a default. TIC Property Management also argued that summary judgment against it was inappropriate because it was not a party to the loan and had no ownership interest in the property. In a supplemental filing, they further added assignments of error that Wells Fargo did not establish that the note had been properly assigned by an allonge and that the trial court erred in granting attorney fees and costs to Wells Fargo.

{¶ 23} The TIC Borrowers also appeal from the trial court's judgment. They claim that the trial court erred in granting summary judgment against them because (1) they did not misappropriate "rents" and the transfer did not occur after an event of default, and (2) Wells Fargo did not establish that the note had been properly assigned by an allonge. The TIC Borrowers further claim that the trial court erred in granting attorney fees and

costs to Wells Fargo. The TIC Borrowers incorporate by reference the additional assignments of error raised by TIC Acropolis and TIC Properties Management.

## II. Summary Judgment Standard

{¶ 24} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

{¶ 25} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 26} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether, as a matter of law, no

genuine issues exist for trial. *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119-20, 413 N.E.2d 1187 (1980).   Therefore, the trial court's decision is not granted deference by the reviewing appellate court.   *Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.), citing *Brown v. Scioto Cty. Bd. Of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

### III. Wells Fargo's Standing

**{¶ 27}** In the TIC Borrower's second assignment of error and in TIC Acropolis's and TIC Properties Management's sixth assignment of error, Appellants claim that the trial court erred in granting summary judgment to Wells Fargo, because LaSalle did not properly indorse the note to Wells Fargo by an allonge.

**{¶ 28}** In order for Wells Fargo to have standing to bring its foreclosure action, Wells Fargo must have had an interest in the note or mortgage at the time it filed suit.[1] *Bank of Am., N.A. v. Thompson*, 2d Dist. Montgomery No. 25952, 2014-Ohio-2300, ¶ 7, citing *Federal Home Loan Mortg. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 28.

**{¶ 29}** R.C. 1303.31(A) identifies three classes of persons who are "entitled to enforce" an instrument, such as a note: (1) the holder of the instrument, (2) a nonholder in possession of the instrument who has the rights of a holder, and (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to R.C.

---

[1] There is disagreement among the Ohio appellate courts as to whether the foreclosing party must have an interest in (1) the promissory note, (2) both the note and mortgage, or (3) either the note or mortgage.   The Ohio Supreme Court has accepted this issue for review in *Deutsche Bank Natl. Trust v. Holden*, Supreme Court No. 2014-0791.

1303.38 or R.C. 1303.58(D). The term "holder" includes a "person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." R.C. 1301.201(B)(21)(a).

{¶ 30} The trial court found that LaSalle negotiated the note to Wells Fargo prior to the commencement of this action, as evidenced by an allonge affixed to the note and indorsed by LaSalle in favor of Wells Fargo. "An allonge is defined as '[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements.'" (Citation omitted.) *HSBC Bank USA v. Thompson*, 2d Dist. Montgomery No. 23761, 2010-Ohio-4158, ¶ 56. "An indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement." *Id.* at ¶ 65. Under R.C. 1303.24, which codifies Uniform Commercial Code 3-204, an allonge is considered part of the instrument being indorsed if it is "affixed to the instrument." R.C. 1303.24(A)(2).

{¶ 31} Wells Fargo acknowledges that the allonge was attached to the note by a paper clip. We have found no Ohio cases that have addressed whether a paper clip is sufficient to "affix" an allonge to a note or other instrument, and few cases outside of Ohio exist. The United States District Court for the District of New Hampshire has concluded that attachment by means of a paper clip is sufficient to satisfy UCC 3-204. *Galvin v. EMC Mortg. Corp.*, Civil No. 12-CV-320-JL, 2014 WL 4980905 (D.N.H. Oct. 3, 2014). That court noted that "many commentators have taken the view that the omission of the adverb 'firmly' from the revised version allows just that." *Id.* at * 8.

> [The revised] section merely requires that the paper be "affixed" to the
> instrument. Any manner of attaching the paper to the instrument would

seem to be sufficient. There is no requirement that the paper containing the indorsement be firmly attached to the instrument. Stapling the paper to the instrument is clearly sufficient. Even paper clipping the allonge to the instrument should be sufficient.

*Id.*, quoting 6B Lawrence, *Anderson on the Uniform Commercial Code § 3-204*:12R, at 240 (3d Ed.2003).

{¶ 32} Wells Fargo asserts that we need not decide this issue, because it nevertheless has standing for two reasons: (1) the assignment of the mortgage to it operated as an equitable assignment of the note, and (2) it is a nonholder in possession with the rights of a holder. The trial court found that LaSalle assigned the mortgage and the assignment of rents agreement to Wells Fargo, pursuant to an Assignment of Open-End Mortgage and Security Agreement and of the Assignment of Leases and Rents, dated September 28, 2006, executed by LaSalle, as assignor, in favor of Wells Fargo; the documents were recorded at the Greene County Recorder's Office. The trial court further found that LaSalle, as assignor, executed an Omnibus Assignment, dated September 29, 2006, in favor of Wells Fargo, whereby all rights under the loan were assigned to Wells Fargo.

{¶ 33} We agree with Wells Fargo that the mortgage assignment and Omnibus Assignment were sufficient to provide Wells Fargo standing to bring this action as a nonholder in possession of the note which has the rights of a holder. We explained in *LaSalle Bank Natl. Assn. v. Brown*, 2014-Ohio-3261, 17 N.E.3d 81 (2d Dist.):

[A] person need not be a "holder" of the instrument in order to be entitled to enforce it. Instead, a person can be a nonholder in possession of the

instrument who has the rights of a holder.   This status can be bestowed in various ways.   As was noted in the case of *In re Veal*, 450 B.R. 897 (9th Dist.Ariz. BAP 2011):

> Non-UCC law can bestow this type of status; such law may, for example, recognize various classes of successors in interest such as subrogees or administrators of decedent's estates. See Comment to UCC § 3-301.  More commonly, however, a person becomes a nonholder in possession if the physical delivery of the note to that person constitutes a "transfer" but not a "negotiation."   Compare UCC § 3-201 (definition of negotiation) with UCC § 3-203(a) (definition of transfer).   Under the UCC, a "transfer" of a negotiable instrument "vests in the transferee any right of the transferor to enforce the instrument." UCC § 3-203(b). As a result, if a holder transfers the note to another person by a process not involving an Article 3 negotiation -- such as a sale of notes in bulk without individual indorsement of each note -- that other person (the transferee) obtains from the holder the right to enforce the note even if no negotiation takes place and, thus, the transferee does not become an Article 3 "holder."   See Comment 1 to UCC § 3-203.   *Id.* at 911.

*Brown* at ¶ 36.

**{¶ 34}** Here, LaSalle executed an Assignment of Open-End Mortgage and Security

Agreement and Assignment of Assignment of Leases and Rents granting Wells Fargo its "right, title and interest, of any kind whatsoever," including its rights as mortgagee, to the TIC Acropolis mortgage and assignment of rents agreement; the document was recorded in the county recorder's office on January 23, 2007. In the Omnibus Assignment, LaSalle also assigned to Wells Fargo its rights, title, and interest in the mortgage loan from LaSalle to TIC Acropolis. The Omnibus Assignment stated that the rights assigned included LaSalle's right to any "claims, collateral, insurance polies, certificates of deposit, letters of credit, escrow accounts, performance bonds, demands, causes of action and other collateral arising out of and/or executed and/or delivered in or to or with respect to the Loan, together with any other documents or instruments executed and/or delivered in connection with or otherwise related to the Loan."

**{¶ 35}** Even assuming that the paper-clipped allonge was insufficient to negotiate the note to Wells Fargo, Wells Fargo obtained possession of the note prior to commencing this action, and the Assignment of Mortgage and Omnibus Assignment provide Wells Fargo with the right to enforce the note and mortgage. Accordingly, we find no genuine issue of material fact that Wells Fargo had standing as a nonholder in possession of the instrument who has the rights of a holder.

**{¶ 36}** TIC Borrower's second assignment of error and TIC Acropolis's and TIC Properties Management's sixth assignment of error are overruled.

### IV. TIC Properties Management as a Party-Defendant

**{¶ 37}** In their fifth assignment of error, TIC Acropolis and TIC Properties Management claim that the trial court erred in granting summary judgment to Wells Fargo against TIC Properties Management, because TIC Properties Management was never a

party to the Loan Documents and had no ownership interest in the property. The TIC Borrowers incorporate this argument as their seventh assignment of error.

**{¶ 38}** According to Dennie Morr, Regional Asset Manager for TIC Properties Management, TIC Properties Management does not have any interest in the property, in the loan associated with the property, or in any other property securing or relating to the loan at issue. (Morr Aff. at ¶ 3.)

**{¶ 39}** Wells Fargo has presented no evidence that TIC Properties Management has an interest in the real or personal property at issue. Wells Fargo acknowledges that the property manager is not a borrower under the terms of the loan, but is an agent of the borrowers. Wells Fargo states that TIC Properties Management was an "active participant in the misapplication of Rents," was a necessary party, and properly should be bound by the trial court's judgment.

**{¶ 40}** Wells Fargo's complaint states a foreclosure action. The parties necessary to a foreclosure are the holders of rights or interests in the property. *E.g.*, *Citimortgage, Inc. v. Bocock*, 2d Dist. Montgomery No. 26366, 2014-Ohio-341, ¶ 5 ("A person holding an interest in mortgaged property is a necessary party to a foreclosure action."); *RBS Citizens, N.A. v. Krasnov*, 8th Dist. Cuyahoga No. 100992, 2014-Ohio-4217, ¶ 19. The undisputed evidence is that TIC Properties Management has no rights or interest in the either the real or personal property securing the loan or in the loan associated with the property. TIC Properties Management's status as an agent of the TIC Borrowers does not give rise to a foreclosure claim against it.

**{¶ 41}** TIC Properties Management's and TIC Acropolis's fifth assignment of error and the TIC Borrowers' seventh assignment of error are sustained.

## V. Did TIC Acropolis Default?

{¶ 42} In their first, second, and third assignments of error, TIC Acropolis and TIC Properties Management claim that the trial court erred in granting summary judgment on Wells Fargo's claim that TIC Acropolis was in default by terminating its existence as a limited liability company and thereby triggered the full recourse provisions in the loan. They argue that TIC Acropolis did not terminate its existence as a limited liability company (first assignment of error), that TIC Acropolis did not have a continuing obligation to maintain its existence as an LLC (second assignment of error), and that Wells Fargo cannot establish damages due to the alleged breach of its obligations as a special purpose entity (third assignment of error). The TIC Borrowers incorporate these same arguments as their fourth, fifth, and sixth assignments of error.

{¶ 43} At the outset, we emphasize that TIC Acropolis and the TIC Borrowers do not claim that the trial court erred in finding that they had defaulted on the loan by failing to make monthly payments of principal and interest when due, to fund the Tax and Insurance Escrow Fund, and to fund the Replacement Reserve Fund. As a result, there appears to be no dispute that Wells Fargo was entitled to a decree of foreclosure based on those default events. Significantly, these default events did not trigger the recourse provisions of the Loan Agreement. In contrast, if TIC Acropolis were to dissolve and/or cease to be a special purpose entity, those default events would trigger the full recourse provisions.

## A. Duty to Maintain Existence

{¶ 44} We begin with TIC Acropolis's argument that it did not have a continuing obligation to maintain its existence as a limited liability company. TIC Acropolis asserts

that the loan documents need to be interpreted in light of the fact that it assigned all of its interest in the property. TIC Acropolis argues that its obligations under the original loan documents "continued until all of the TIC Borrowers collectively assumed the entirety of the Loan and collectively became the 100% interest owners in the Property."

{¶ 45} TIC Acropolis contends that the parties' intent to relieve TIC Acropolis of its obligations under the loan documents is evidence by four circumstances: (1) TIC Acropolis was not involved with the loan after the TIC Borrowers obtained 100% ownership of the property; (2) Wells Fargo's agent affirmed TIC Acropolis's conduct by removing TIC Acropolis as a borrower, obligor, or party to the 2012 agreements that modified the loan; (3) Wells Fargo's agent took no action after it was notified in 2012 that TIC Acropolis had filed a Certificate of Cancellation; and (4) TIC Acropolis's existence serves no discernible purpose after the TIC Borrowers assume full ownership of the property.

{¶ 46} When reviewing a contract, the court's primary role is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). A contract that is, by its terms, clear and unambiguous requires no interpretation or construction and will be given the effect called for by the plain language of the contract. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989).

{¶ 47} A contract is ambiguous if its provisions are susceptible to two or more reasonable interpretations. *Johnson v. Johnson*, 2d Dist. Miami No. 2010 CA 2, 2011-Ohio-500, ¶ 11. "If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contract, in

determining the parties' intent. Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." (Citations omitted.) *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55-56, 716 N.E.2d 1201 (2d Dist.1998); *GZK, Inc. v. Schumaker Ltd. Partnership*, 2d Dist. Montgomery No. 19764, 2003-Ohio-5842, ¶ 20.

**{¶ 48}** Several provisions within the Loan Documents address TIC Acropolis's continued existence as a limited liability company and a special purpose entity. Section 1.1 of the Loan Agreement defines a "special purpose entity" under that agreement. It provides, in part, that a "special purpose entity" includes a limited liability company "which at all times on and after the date hereof: * * *

(iv) *has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution*, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of * * * membership interests, or amendment of its * * * articles of organization, certificate of formation, limited liability company agreement and/or operating agreement * * *;

(ix) if such entity is (a) a limited liability company, has articles of organization, a certificate of formation, limited liability agreement and/or an operating agreement, as applicable * * * that, in each case, provide that *such entity will not: (1) dissolve*, merge, liquidate, consolidate; (2) except as permitted herein, sell all or substantially all of its assets * * *, (3) engage in

any other business activity, or amend its organizational documents with respect to the matters set forth in this definition without the consent of the Lender; or (4) file a bankruptcy or insolvency petition * * *.

(Emphasis added.)

{¶ 49} Section 5 of the Loan Agreement sets forth numerous "Borrower Covenants." In that Section, TIC Acropolis further agreed that it would not "(a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity * * *, [or] (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, in each case, without obtaining prior written consent of Lender or Lender's designee (which shall not unreasonably be withheld)." (Section 5.2.3, Dissolution.) Section 5.2.13(b) allowed the "Sponsor Borrower" to transfer title to one or more undivided interests in the property to one or more entities (up to 35) as additional tenants-in-common. However, that subsection further provided that "[s]uch transfer is not construed so as to relieve Sponsor Transferor of any personal liability under the Note or any of the other Loan Documents."

{¶ 50} The Partial Loan Assumption Agreement also indicated that TIC Acropolis was not relieved of its obligations by virtue of the assignments of its interests in the property to the TIC Borrowers. Under Statement of Agreement, the parties agreed:

Nothing contained herein is intended to terminate or revoke any guaranties or indemnities or liability or obligations of Assigning Borrower and/or John W. Boyd [CEO of TIC Acropolis] as an indemnitor or guarantor under any indemnity and/or guaranty executed by any such party in favor of Lender in connection with the Loan, and such instruments shall continue in full force

and effect notwithstanding the assignment affected herein. (Paragraph 1(c).) The parties' intentions were expressly stated in Paragraph 11, titled "No Release of Assigning Borrower," which provides: "Nothing contained herein shall be deemed a release by Lender of Assigning Borrower with respect to its obligations under the Loan Documents."

{¶ 51} TIC Acropolis is not a party to the Lockbox Agreements, executed in 2012. The Case Management Agreement identifies TIC Acropolis as "Original Borrower" and refers to TIC Acropolis only to point out that TIC Acropolis entered into the loan and then assigned to the TIC Borrowers an undivided tenant-in-common interest in the property and TIC Acropolis's obligations under the loan documents. TIC Acropolis asserts that the Lockbox Agreements constitute a waiver by the Lender of TIC Acropolis's obligations under the Note, Mortgage, and Loan Agreement. However, there are no express provisions in the Lockbox Agreements that relieve TIC Acropolis of its obligations.

{¶ 52} Finally, TIC Acropolis stated in its Certificate of Correction, filed with the Delaware Secretary of State: "This entity must remain active as it is an integral part of an ownership structure and is required to be active in order to facilitate the execution of documents."

{¶ 53} Based on the evidence before the trial court, we find no genuine issue of material fact that TIC Acropolis was required to continue its existence as a limited liability company. The Loan Agreement and the Partial Loan Assumption Agreement provide that TIC Acropolis was required to maintain its existence as a limited liability company until the Note was paid, absent written consent to dissolve from the Lender; there is no evidence that TIC Acropolis asked for and received consent to dissolve. TIC Acropolis's

statement in its Certificate of Correction acknowledged its obligation to "remain active."

{¶ 54} TIC Acropolis's and TIC Properties Management's second assignment of error and the TIC Borrowers' fifth assignment of error, both of which concern TIC Acropolis's continuing obligation to maintain its existence, are overruled.

## B. Did TIC Acropolis Maintain its Existence?

{¶ 55} TIC Acropolis argues that, although it filed a Certificate of Cancellation with the Delaware Secretary of State in 2008, it did not violate its obligation to maintain its existence as a limited liability company and a special purpose entity. It contends that, by operation of Delaware law, its "mistaken" filing of a Certificate of Cancellation was nullified by the filing of its Certificate of Correction.

### 1. Delaware Law and TIC Acropolis's filings

{¶ 56} Under Delaware law, a limited liability company is formed at the time of the filing of an initial certificate of formation in the office of the Secretary of State. Del.Code Ann., Title 6 § 18-201(b). The existence of the limited liability company continues "until cancellation of the limited liability company's certificate of formation." *Id.*

{¶ 57} "A Delaware limited liability company's dissolution may be characterized as the beginning of the end of its legal existence. Dissolution necessitates winding up, which commences upon dissolution. Winding up is the process by which the dissolved limited liability company settles and closes its business, disposes of and conveys its property, discharges or provides for its liabilities, and distributes any remaining assets to its members and other constituents. The cancellation of the company's certificate of formation is effected at the completion of winding up. This marks the end of the entity's legal existences as a limited liability company." Symonds & O'Toole, *Symonds and*

*O'Toole on Delaware Limited Liability Companies*, Section 16.01 (2009 Suppl.)

{¶ 58} To accomplish the cancellation of a limited liability company's certificate of formation, a certificate of cancellation must be filed in the office of Secretary of State upon the dissolution and the completion of winding up of the limited liability company. Del.Code Ann., Title 6 § 18-203(a). A certificate of cancellation that is filed prior to the dissolution or the completion of winding up of a limited liability company may be corrected as an erroneously executed certificate of cancellation by filing a certificate of correction, pursuant to Del.Code Ann., Title 6 § 18-211, with the Secretary of State. Del.Code Ann., Title 6 § 18-203(b).

{¶ 59} A certificate of correction must specify the inaccuracy or defect to be corrected, the portion of the certificate in corrected form, and it must be executed and filed. Del.Code Ann., Title 6 § 18-211(a). "The certificate of correction shall be effective as of the date the original certificate was filed, except as to those persons who are substantially and adversely affected by the correction, and as to those persons the certificate of correction shall be effective from the filing date." *Id.*

{¶ 60} TIC Acropolis filed a Certificate of Cancellation, dated September 16, 2008, with the Delaware Secretary of State on November 5, 2008. As part of the negotiation of the Lockbox Agreements in 2012, Dennie "Stew" Morr, Regional Asset Manager of TIC Properties Management, informed Daniel Kim, an Account Manager for KeyBank, that TIC Acropolis "no longer exists;" Morr forwarded to Kim a copy of the Certificate of Cancellation. (Morr Aff., Doc. #113, Ex. B-1)

{¶ 61} On October 4, 2013, TIC Acropolis filed a Certificate of Correction, which stated, in part: "The Certificate of Cancellation was inadvertently filed. This entity must

remain active as it is an integral part of an ownership structure and is required to be active in order to facilitate the execution of documents." The Certificate of Correction further stated that the Certificate of Cancellation is corrected to read "intentionally left blank" and that "This Certificate of Correction hereby renders the Certificate of Cancellation filed on November 5, 2008 null and void."

{¶ 62} John Boyd, CEO of TIC Acropolis, stated in his December 3, 2014 affidavit that, "[a]t no point prior to or following the filing of the Certificate of Cancellation did TIC Acropolis dissolve or wind up its affairs under or pursuant to the relevant provisions contained in the Operating Agreement, or pursuant to the applicable provisions for dissolution of a limited liability company contained in Delaware Code Annotated, Title 6, § 18-801 *et seq*." A copy of the TIC Acropolis's Operating Agreement and the certificates filed with Delaware Secretary of State were attached to his affidavit.

**2. Did TIC Acropolis Admit that it had Dissolved?**

{¶ 63} Wells Fargo asserts that TIC Acropolis admitted in its Answer that it dissolved in 2008 and that TIC Acropolis cannot repudiate that statement or present contradictory evidence in a subsequent affidavit, i.e., Boyd's December 3, 2014 affidavit.

{¶ 64} "A judicial admission is a distinct and unequivocal statement, made by a party or a party's counsel during a judicial proceeding, which acts as a substitute for evidence at trial." *In re Regency Village Certificate of Need Application*, 10th Dist. Franklin No. 11AP-41, 2011-Ohio-5059, ¶ 32. "To operate as a judicial admission, an allegation in a pleading must be an allegation of a material and competent fact and not a mere statement of a legal conclusion." *Faxon Hills Const. Co. v. United Broth. of Carpenters and Joiners of America*, 168 Ohio St. 8, 151 N.E.2d 12 (1958),

paragraph one of the syllabus. "It is generally held that where a party has alleged a matter of fact in his pleadings, the pleadings are evidence against him as an admission of fact so alleged." *Shifflet v. Thomson Newspapers (Ohio), Inc.*, 69 Ohio St.2d 179, 187, 431 N.E.3d 1014 (1982).

{¶ 65} In its Complaint, Wells Fargo alleged that TIC Acropolis, the original borrower, "dissolved in violation of the Loan Documents." (Complaint, ¶ 2.) Wells Fargo further alleged:

33. Borrower agreed in Section 5.2.3 of the Loan Agreement not to "engage in any dissolution" or to "modify, amend, waive or terminate its organization documents or its qualification and good standing in any jurisdiction, in each case, without obtaining the prior written consent of Lender or Lender's designee (which shall not unreasonably be withheld)." Such consent from Lender was never sought and, therefore, never obtained.

34. In 2008, Sponsor Borrower [TIC Acropolis] terminated its existence as a limited liability company under the laws of the State of Delaware. Sponsor Borrower's failure to maintain its existence as a legal entity is a breach of Sections 5.1.1 and 5.2.3 of the Loan Agreement. Sponsor Borrower's failure to timely cure such breach is an Event of Default under Section 8.1(xii) of the Loan Agreement. Sponsor Borrower's failure to maintain its status as a "Special Purpose Entity" is a breach of Section 4.1.30 of the Loan Agreement and an Event of Default under Section 8.1(ix) of the Loan Agreement.

**{¶ 66}** TIC Acropolis responded in its Answer stating, "With respect to any allegations set forth in the unnumbered first paragraph of the Complaint, these Defendants deny that TIC Acropolis is a dissolved entity." (Answer, ¶ 1.) TIC Acropolis responded to paragraph 33 of the Complaint, stating that the Loan Agreement speaks for itself and, further, that

> TIC Acropolis's obligations under the Loan Agreement were assumed by the Tenant-In-Common Borrowers, per various Partial Loan Assumption Agreements, and therefore TIC Acropolis was not required to seek or obtain Lender's consent before dissolution. Except as specifically admitted, these Defendants deny the remaining allegations of paragraph 33 of the Complaint.

(Answer, ¶ 34.) TIC Acropolis addressed paragraph 34 of the Complaint, as follows:

> Answering as to paragraph 34, these Defendants admit that TIC Acropolis dissolved in 2008 and was subsequently reinstated as a limited liability company under the laws of the State of Delaware. Except as specifically admitted, these Defendants deny the allegations of paragraph 34 of the Complaint.

(Answer, ¶ 35.) TIC Acropolis raised as an affirmative defense that Wells Fargo's claims were barred "since TIC Acropolis exists as a legal entity and any breach has been cured."

**{¶ 67}** TIC Acropolis did state in its Answer that it "dissolved in 2008." However, reading the Answer in its entirety, TIC Acropolis further denied that it was a dissolved entity, and it asserted that its dissolution was cured under the laws of the State of

Delaware. Whether TIC Acropolis, in fact, dissolved is a matter that would require interpretation of TIC Acropolis's compliance with Del.Code Ann., Title 6, § 18-801, defining when dissolution occurs, and TIC Acropolis's operating agreement. And, even if dissolution did occur, Delaware law provides for revocation of dissolution. *See* Del.Code Ann., Title 6 § 18-806.

{¶ 68} In short, it is unclear from the Answer whether TIC Acropolis's use of the term "dissolved" was intentional or simply inartful. It appears that TIC Acropolis may have used "dissolved" to refer to its filing of a Certificate of Cancellation, but dissolution is not the same as cancellation of a certificate of formation, *see* Del.Code Ann., Title 6 § 18-203. Rather, the filing of a certificate of cancellation is the last step in the termination of a limited liability company, following dissolution and the completion of winding up the company's affairs. Reading TIC Acropolis's Answer as a whole, we conclude that TIC Acropolis's statement in its Answer that it "dissolved in 2008" was ambiguous and a mere statement of a legal conclusion, which did not foreclose TIC Acropolis from arguing and presenting evidence that, under the laws of Delaware, its 2008 "dissolution" was a legal nullity.

### 3. Genuine Issue of Material Fact Exists Regarding Dissolution

{¶ 69} Construing the evidence (including Boyd's affidavit) in the light most favorable to TIC Acropolis, we find that a genuine issue of material fact exists as to whether TIC Acropolis breached the Loan Agreement by terminating its existence as a special purpose entity.

{¶ 70} The critical issue is whether TIC Acropolis dissolved and wound up its affairs prior to filing its Certificate of Cancellation. If it did, as TIC Acropolis's Answer

might suggest, TIC Acropolis could not use a certificate of correction to "undo" its certificate of cancellation. *See* Del.Code Ann., Title 6 § 18-203(b). If, on the other hand, the 2008 Certificate of Cancellation were filed prior to the dissolution or the completion of winding up, Section 18-203(b) permitted TIC Acropolis to correct its certificate of cancellation by filing a certificate of correction. Del.Code Ann., Title 6 § 18-203(b).

**{¶ 71}** Wells Fargo asserts that, even if TIC Acropolis could file a certificate of correction, it (Wells Fargo) would be substantially and adversely affected by the correction, and thus the certificate of correction would be effective only from its filing date, October 4, 2013. *See* Del.Code Ann., Title 6 § 18-211(a). Wells Fargo argues that retroactive application of the certificate of correction would cause Wells Fargo to lose its ability to seek a deficiency judgment against TIC Acropolis. We do not accept this argument.

**{¶ 72}** Wells Fargo has provided no evidence that, between the filing of the certificate of cancellation and the certificate of correction, TIC Acropolis engaged in any conduct that altered the benefits it provided as an on-going special purpose entity. For example, there is no evidence that TIC Acropolis acquired additional real estate or incurred new liabilities, engaged in conduct that would decrease its insulation from the consequences of a related-party's business activities, or increased its risk of becoming subject to a bankruptcy proceeding. Wells Fargo has presented no evidence to suggest that it would be substantially and adversely affected by the correction. To the contrary, retroactive application would cure TIC Acropolis's alleged failure to maintain its status as a special purpose entity.

**{¶ 73}** Due to the existence of a genuine issue of material fact, the trial court erred

in granting summary judgment to Wells Fargo on the ground that TIC Acropolis terminated its existence as a special purpose entity. TIC Acropolis's and TIC Properties Management's first assignment of error and the TIC Borrowers' fourth assignment of error (termination of existence) are sustained. We need not address TIC Acropolis's and TIC Properties Management's third assignment of error and the TIC Borrowers' sixth assignment of error (damages due to the alleged breach of its SPE status obligations), and those assignments of error are overruled as moot.

## VI. Misappropriation of Rents

{¶ 74} In their fourth assignment of error, TIC Acropolis and TIC Properties Management claim that the trial court erred in granting summary judgment on Wells Fargo's claim that rents misappropriated after an event of default triggered recourse provisions of the Loan Agreement. They argue that the funds that were transferred were not "rents" and that the transfer did not occur after an event of default. The TIC Borrowers raise the same argument in their first assignment of error.

{¶ 75} We need not address these arguments, because the trial court did not grant summary judgment to Wells Fargo on the ground that rents had been misappropriated. The trial court's judgment stated:

> Borrower is in default under the Loan Documents for, among other things, failure to make monthly payments of principal and interest when due, failure to fund the tax and insurance escrow accounts, failure to fund the Replacement Reserve Fund, and Sponsor's termination of its existence as a limited liability company under the laws of the State of Delaware.

Nowhere in the trial court's judgment is the alleged misappropriation of rents mentioned.

(Doc. # 184, ¶ L.)   We decline to address this issue for the first time on appeal.

{¶ 76}   The assignments of error are overruled.

### VII. Attorneys' Fees

{¶ 77} The TIC Borrower's third assignment of error claims that the trial court erred in its award of attorneys' fees and costs, because Wells Fargo never filed any affidavits that established the amount of attorneys' fees and costs were reasonable and necessary to litigate the case.   TIC Acropolis and TIC Properties Management also raise this issue in their seventh assignment of error.

{¶ 78} In paragraph S of the judgment entry, the trial court found that, through October 31, 2014, Wells Fargo had incurred $236,678.50 in attorneys' fees and $18,771.69 in costs in enforcing its rights under the loan documents.   The trial court found that Wells Fargo was "entitled to this amount plus all additional costs, expenses, and attorneys fees' [sic] incurred by Plaintiff in this action through the date of confirmation of a judicial sale of the Property (collectively, 'Plaintiff's Expenses')."

{¶ 79} In support of its request for attorneys' fees and costs, Wells Fargo provided an affidavit by Teri Barclay, Vice President-Asset Manager of Situs Holdings, LLC, special servicer, pursuant to a Pooling and Servicing Agreement, dated September 1, 2006, for Wells Fargo, as Trustee.   (Doc. #116, Ex. A.)   Barclay stated that her affidavit was based on her review of Wells Fargo's and Situs Holding's business records relating to the TIC Acropolis loan, including computerized records indicating sums advanced and payments on the account.   In paragraph 23 of her affidavit, Barclay stated: "Through October 31, 2014, Plaintiff has incurred $236,678.50 in reasonable attorneys' fees and $18,771.69 in reasonable costs in enforcing its rights under the Loan Documents, and

both expenses and attorneys' fees will continue to accrue through the confirmation of a judicial sale of the subject real and personal property."

{¶ 80} Wells Fargo's request for attorneys' fees and costs was not challenged in either the TIC Borrowers' memorandum in opposition to summary judgment (Doc. #153) or TIC Acropolis's and TIC Properties Management's memorandum in opposition to summary judgment (Doc. #151).

{¶ 81} Although Defendants did not contest the amount of Wells Fargo's requested fees and costs before the trial court, Wells Fargo had an initial burden to establish its entitlement to those amounts. The Loan Agreement provides that the Borrower agreed to pay "reasonable attorneys' fees and costs" if an action were brought to foreclose the mortgage. (Loan Agreement, § 5.1.14.) Thus, Wells Fargo established that it was entitled to seek reasonable attorneys' fees and costs from the Borrowers.

{¶ 82} We conclude, however, that Barclay's affidavit was inadequate to meet Wells Fargo's initial burden to establish the amount of reasonable attorneys' fees and costs to which Wells Fargo was entitled. According to her affidavit, Barclay is an employee of the Special Servicer, not Wells Fargo, and she stated in her affidavit that she had reviewed business records related to the TIC Acropolis loan. Nothing in Barclay's affidavit suggests that she had access to and reviewed billing statements from Wells Fargo's attorneys in connection with this litigation. In addition, there is no indication that Barclay is an attorney or had an ability to evaluate whether $236,678.50 in attorneys' fees and $18,771.69 in costs were reasonable.

{¶ 83} The assignment of error is sustained.

**VIII. Conclusion**

{¶ 84} The trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings. Specifically, the following portions of the trial court's judgment will be reversed: (1) the trial court's grant of summary judgment to Wells Fargo on the ground that TIC Acropolis terminated its existence as a limited liability company, (2) the award of a specific amount of attorneys' fees and costs, (3) the order granting a deficiency judgment to Wells Fargo, and (4) the grant of summary judgment against TIC Properties Management and the denial of its motion for summary judgment; this matter will be remanded for further proceedings on these issues. In all other respects, the trial court's judgment will be affirmed.

{¶ 85} We emphasize that, because the trial court granted summary judgment to Wells Fargo on three additional non-recourse events of default, Wells Fargo remains entitled to a decree of foreclosure and, thus, many provisions of the trial court's judgment are unaffected by our Opinion. The unaffected portions include (1) the trial court's order that, unless the judgment (note balance and interest) is fully paid within three days, the equity of redemption be foreclosed and the property sold, and (2) the trial court's determination of the priority of disbursement of sale proceeds.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Victoria E. Powers
James H. Greer
Philip M. Borger
Terry D. Bork
Hon. Stephen A. Wolaver