[Cite as *KSMAC Holdings, Ltd. v. Ice Zone Realty, Ltd.*, 2022-Ohio-1456.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

KSMAC HOLDINGS, LTD.,

Plaintiff-Appellant,

v.

ICE ZONE REALTY, LTD, et al.,

Defendants-Appellees.

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0001**

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2018 CV 03013

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, David A. D'Apolito, Judges.

**JUDGMENT:**
Affirmed in part. Reversed in part.
Remanded in part.

*Atty. Marshal M. Pitchford* and *Atty. Kathryn A. Vadas*, DiCaudo, Pitchford & Yoder, LLC, 209 South Main St., Third Floor, Akron, Ohio 44308, for Plaintiff-Appellant

*Atty. James F. Lang* and *Atty. Matthew A. Chiricosta*, Calfee, Halter & Griswold LLP, The Calfee Building, 1405 East Sixth Street, Cleveland, Ohio 44114-1607, for Defendants-Appellees.

Dated: March 31, 2022

_____

**WAITE, J.**

{¶1} Appellant, KSMAC Holdings, Ltd., appeals from a Mahoning County Court of Common Pleas judgment entry granting Appellees' motion for summary judgment. Ice Zone Realty, Ltd. ("Ice Realty"); Ice Zone, Ltd. ("Ice Zone"); Phantom Fireworks Eastern Region, LLC; Phantom Fireworks Western Region, LLC; Phantom Fireworks Store Sales, LLC; Phantom Fireworks Administrative, LLC; and Bruce J. Zoldan ("Zoldan") are collectively the Appellees in this matter. Based on the following, the judgment of the trial court is affirmed in part, reversed in part and remanded.

Factual and Procedural History

{¶2} This appeal arises from a real estate purchase agreement ("Agreement") entered into by Appellant and one of the Appellees, Ice Realty. In November 2015, Appellant's predecessor, KAZZMAC, Inc., entered into a five-year lease with Ice Realty to rent space in the building located at 360 McClurg Road in Boardman, Ohio ("the Property") in order to operate a trampoline park. Another Appellee, Ice Zone, operated an ice rink business in the other half of the building. The lease agreement contained a purchase option provision giving KAZZMAC, Inc. the option to purchase the Property for $1.85 million.

{¶3} In October of 2017, Appellant sent Ice Realty a letter formally exercising the purchase option. Counsel for Appellant drafted the Agreement and, after negotiations

Case No. 21 MA 0001

between the parties, the Agreement was signed in December of 2017. The Agreement contains a key provision which is at the core of this appeal. Section 1, entitled Agreement to Sell, provides:

> Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase and take from Seller, the property located at 360 McClurg Rd., Boardman, Ohio 44512, as more particularly described on Exhibit A attached hereto and by this reference incorporated herein, together with all building(s),fixtures [sic], privileges, entitlements, easements, rights, appurtenances and improvements thereto (individually, the "Property"). For purposes of this Agreement "fixtures" includes all items permanently attached to the building, including but not limited to, ice rink boards, scoreboard, bleachers, chilling equipment, and lockers.

(Real Estate Purchase Agreement, Section 1.)

{¶4} Along with the Property and fixtures, Appellant also agreed to assume certain obligations of Ice Realty, incorporated into the Agreement as Attachment 10(g). The obligations included an elevator service contract and existing skating contracts for: Adaptive Hockey; Canfield High School; Debiec Hockey; Figure Skating Club; Maria Koman; Mahoning VSP; YSU Hockey; Youth Hockey; Youth Hockey Games; Phantoms Hockey; and Phantoms Try Out Camps. The inclusion of these contracts into the purchase of the Property meant Appellant would be responsible for the continuation of these existing contracts effective at the time of closing, as noted in Section 10, entitled "Representations of Seller." Part (g) of the Agreement reads, in part, "[t]here are no

Case No. 21 MA 0001

agreements affecting the Property which may be binding on the Property or Buyer after the Closing other than the contracts specifically attached hereto as Attachment 10(g)."

{¶5} Sometime after the Agreement was signed but before closing, Ice Realty and Ice Zone removed from the building all of their personal property. According to the record, employees of Ice Zone and Phantom Fireworks (another Appellee) were present, along with some employees of Appellant. Appellant's employees were physically prohibited from entering certain areas to inspect this removal, including the area where Appellees undertook the removal of the refrigerant liquid ("refrigerant") from the Ice Pro CW Davis Liquid Overfeed System ("Ice Pro System"). In brief, the Ice Pro System consists of 200 feet of piping evenly spaced under the ice rink flooring, through which the refrigerant is pushed from one end to the other. The refrigerant carries away heat from the floor and carries in cold refrigerant in a constant loop to keep the ice rink floor frozen. The refrigerant was removed over a period of two days by a licensed reclamation contractor hired by Ice Zone.

{¶6} On December 29, 2017, Appellant closed on its purchase pursuant to the purchase Agreement and obtained possession of the property. Shortly after closing Appellant became aware of the lack of refrigerant in the Ice Pro System when it noticed the ice floor was melting, and one of Appellees' employees informed Appellant not to turn on the Ice Pro System or it could "blow up." (Fortunato Depo., p. 68; MacGregor Depo., pp. 23-24). Soon thereafter, Appellant demanded that the refrigerant be transferred back to Appellant in order to freeze the rink floor. Ice Realty refused the demand, claiming that the refrigerant was the personal property of Ice Zone and was not included in the sale. Appellant ordered replacement refrigerant immediately to ensure the Ice Pro System

could be operated to refreeze the rink at a cost in excess of $200,000. Appellant also incurred other expenses related to the lack of refrigerant and complete shut-down of the Ice Pro System.

{¶7} Appellant filed a complaint against Appellees raising claims of breach of contract; promissory estoppel; unjust enrichment; liability for civil theft; conversion; fraud; and negligent misrepresentation, and sought to pierce the corporate veil against all defendants. Appellees filed a motion to dismiss pursuant to Civ.R. 12(B)(6) on January 30, 2019. Appellant filed a brief in opposition on February 22, 2019, addressing only the claims for breach of contract, fraud, negligent representation and conversion. The trial court denied Appellees' motion to dismiss on October 1, 2019.

{¶8} On August 7, 2020, Appellees filed a motion for summary judgment addressing all of the claims raised by Appellant in the complaint. In their motion, Appellees argued that the doctrine of economic loss barred Appellant's claims of liability for civil theft, conversion and fraud. Appellees also contended that the claims of liability for civil theft, conversion, fraud and negligent misrepresentation were improperly duplicative of the breach of contract claim. Appellees asserted that Appellant failed to present evidence showing there were any misstatements made by Appellees (or there was any legally actionable reliance by Appellant on any misstatements) to establish claims of promissory estoppel, fraud or negligent representation. Appellees argued that a claim for negligent misrepresentation does not apply to ordinary business transactions and that the claims for conversion and civil theft must fail because it is legally impossible for Appellees to steal their own property. In the motion they argued that the promissory estoppel and unjust enrichment claims must be dismissed because they are quasi-

contractual in nature and can be maintained only where no express contract exists. Appellees contended that piercing of the corporate veil is a remedy and not a stand-alone claim. Finally, Appellees argued that Appellant's breach of contract claim must fail because refrigerant is not encompassed by the term "chilling equipment" under the definition of "fixture" in the unambiguous language of the Agreement.

{¶9} Appellant filed a motion in opposition on September 13, 2020 addressing only their claims of breach of contract, conversion, fraud, and piercing the corporate veil. Appellant asserted that the term "chilling equipment," found under the term "fixtures" within the unambiguous language of the Agreement, included the refrigerant. Thus, Appellees breached the contract by illegally removing the refrigerant from the Ice Pro System. Appellant contended that its claims for fraud and conversion are actionable because Appellees removed the refrigerant, which was a fixture, from the Property prior to Appellant taking possession. Appellant also argued that the economic loss doctrine did not apply to preclude the claims for conversion and fraud because the removal of the refrigerant caused physical damage to the Ice Pro System, resulting in an economic loss to Appellant. Finally, Appellant maintained that their demand to pierce the corporate veil was still viable, but that additional discovery was needed and the trial court should hold that issue in abeyance pending the ability of Appellant to obtain the requested discovery from Appellees. On December 9, 2020, the trial court granted Appellees' motion for summary judgment in its entirety on all the claims contained in the complaint.

{¶10} Appellant filed this timely appeal.

## Standard of Review

Case No. 21 MA 0001

**{¶11}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

**{¶12}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt,* 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.,* 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

{¶13} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327, 364 N.E.2d 267.

{¶14} On appeal, Appellant challenges the trial court's decision to grant summary judgment regarding the breach of contract claim in its first two assignments of error and the fraud and conversion claims in its third assignment of error. The first and second assignments will be addressed together for clarity.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT'S DECISION COMPLETELY IGNORES THE TERMS OF THE PURCHASE AGREEMENT.

<u>ASSIGNMENT OF ERROR NO. 2</u>

THE TRIAL COURT ERRED IN DECIDING THE REFRIGERANT CONSTITUTES PERSONAL PROPERTY.

{¶15} In its first assignment of error, Appellant challenges the trial court's decision to grant summary judgment on Appellant's breach of contract claim. Specifically, the trial court erred when it held, "[t]he Court concludes that the unambiguous phrase 'chilling equipment' cannot be reasonably construed to include the refrigerant." (12/09/20 J.E., p. 11.) At the outset, we recognize Appellant raised the claim for breach of contract against

all named defendants in the action. However, the only parties to the Agreement were Appellant and Ice Realty. Thus, Appellant had a potentially viable claim for breach of contract only against Ice Realty and none of the other named defendants, because they were not parties to the Agreement.

{¶16} Appellee Ice Realty contends the trial court properly determined, as a matter of law, that refrigerant is not encompassed by the term "chilling equipment" in the Agreement and summary judgment was appropriate on the breach of contract claim.

{¶17} Both parties maintain the language of the Agreement is clear and unambiguous, arguing respectively that refrigerant is, and is not, encompassed in the contract under the term "chilling equipment." Appellant contends the unambiguous language of Section 1 of the Agreement makes it clear that the refrigerant is encompassed under the term "chilling equipment," meaning that the refrigerant was a fixture that was included in the purchase. Therefore, Appellee breached the contract by removing the refrigerant or allowing it to be removed with Ice Zone. Appellee asserts the opposite: that the unambiguous language of the contract clearly shows that refrigerant is not part of the term "chilling equipment" and, so, was the personal property of Ice Zone and not subject to the Agreement. While not parties to the purchase Agreement, all Appellees advance the contention that the refrigerant was Ice Zone's personal property.

{¶18} "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. * * * However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.,* 15 Ohio St.3d 321, 322, 474 N.E.2d 271

(1984). "Unlike determinations of fact which are given great deference, questions of law are reviewed by a court *de novo*." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995).

**{¶19}** The overriding purpose of contract construction is to determine the intent of the parties, which is presumed to reside in the language of the Agreement. *Graham v. Drydock Coal. Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). Extrinsic evidence is admissible in determining the intent of the parties if the contract is unclear or ambiguous or if the circumstances surrounding the agreement give the plain language special meaning. *Id.* at 313-314, citing *Shifrin v. Forest City Ent., Inc.,* 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). "If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Saunders v. Mortensen,* 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9.

**{¶20}** "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 245-246, 374 N.E.2d 146 (1978). "Even though most words in the English language have multiple meanings, ambiguity should not be created where it does not exist." *Dominish v. Nationwide Ins. Co.,* 129 Ohio St.3d 466, 2011-Ohio-4102, 953 N.E.2d 820, ¶ 7. A court should not read particular words or phrases in isolation. *Id.* at ¶ 8. If intent of the parties cannot be determined from the contract or if a provision is "reasonably susceptible of more than one meaning," then it is ambiguous. *Lightning Rod. Mut. Ins. Co. v. Southworth,* 151 Ohio St.3d 70, 2017-Ohio-7438, 86 N.E.2d 274, ¶ 12. If the language of the contract is ambiguous, the intent

of the parties becomes a question of fact. *Savoy Hosp., L.L.C. v. 5839 Monroe St. Assocs., L.L.C.,* 6th Dist. Lucas No. L-14-1144, 2015-Ohio-4879, ¶ 31, citing *Beverly v. Parilla,* 165 Ohio App.3d 802, 808, 2006-Ohio-1286, 848 N.E.2d 881, ¶ 26 (7th Dist.). If an ambiguity exists, courts are permitted to consider extrinsic evidence in order to determine the parties' intent. *Wells Fargo Bank, N.A. v. TIC Acropolis, L.L.C.,* 2d Dist. Greene No. 2015-CA-32, 2016-Ohio-142, ¶ 47. Extrinsic evidence includes the circumstances surrounding the parties at the time the contract was entered and the objectives intended to be accomplished by entering into the contract. *Oryann, Ltd. v. SL & MB, L.L.C.,* 11th Dist. Lake No. 2014-L-119, 2015-Ohio-5461, ¶ 26. This includes the consideration of the parties' negotiations. *Id.,* citing *Pharmacia Hepar, Inc. v. Franklin,* 111 Ohio App.3d 468, 475, 676 N.E.2d 587 (12th Dist.1996). If the use of extrinsic evidence fails to clarify the meaning of the contract, then the contract is strictly construed against the drafter. *Cadle v. D'Amico,* 2016-Ohio-4747, 66 N.E.3d 1184, ¶ 33 (7th Dist.). Construing the written contract against the drafter is a secondary rule of contract construction. *Id.* We also note that an appellate court will not reverse a factual finding of the trial court as long as it is supported by some competent, credible evidence. *C.E. Morris Co., v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

**{¶21}** With these construction principles in mind, we turn our attention to the language of the Agreement and the trial court's judgment.

**{¶22}** The pertinent provision, as cited above, is found in Section 1 and entitled, "Agreement to Sell." The final sentence of the clause is at the heart of the dispute. It reads, "[f]or purposes of this Agreement, 'fixtures' includes all items permanently attached

Case No. 21 MA 0001

to the building, including but not limited to ice rink boards, scoreboard, bleachers, chilling equipment, and lockers." (Real Estate Purchase Agreement, Section 1.)

{¶23} The trial court concluded, "the unambiguous phrase 'chilling equipment' cannot be reasonably construed to include the refrigerant." (12/9/20 J.E., p. 11.)

{¶24} In their second assignment of error, Appellant argues that, in reaching this conclusion, the trial court failed to interpret and/or define the actual term in the contract, "chilling equipment," and instead improperly inserted the word "refrigerant" into the language of the contract by concluding it was not encompassed in the term "chilling equipment." Essentially, Appellant argues that the trial court determined what "chilling equipment" is not, refrigerant, without first setting forth a definition for the actual term "chilling equipment."

{¶25} Appellees contend the trial court's finding is correct, and analogize refrigerant to gasoline or oil in a car. A review of the record reveals the trial court used the same language, verbatim, that Appellees set forth in their motion for summary judgment to decide this issue. (8/7/20 Defendants' Motion for Summary Judgment.) In fact, the lion's share of the language in the trial court's December 9, 2020 judgment entry is taken verbatim from the motion for summary judgment. Appellees also assert that since it was Appellant's counsel who drafted the majority of the Agreement, this language must be construed against the drafter, so that Appellees are entitled to judgment in their favor. We must note at the outset that we disagree with Appellees' contention in this regard, as construing a contract against the drafter is a secondary rule of contract construction. Again, it is only applicable when the primary rules of contract construction (plain language

of the document and then extrinsic evidence) fail to clarify the meaning of the contract and/or the intent of the parties. *Cadle* at ¶ 33.

**{¶26}** The basis of the dispute, and all of Appellant's claims, involve a determination and definition of the term "chilling equipment" in the Agreement. If the definition of "chilling equipment" encompasses the liquid refrigerant that cools the system, then Appellees removed a fixture from the property, Appellant's claims have merit, and summary judgment is not proper. If the definition of "chilling equipment" does not include the refrigerant, then the refrigerant is the personal property of Ice Zone and not subject to the sale, and summary judgment on Appellant's claims regarding this issue was appropriate.

**{¶27}** The term "chilling equipment" is not defined within the Agreement. Therefore, we must determine the common meaning of the phrase. One common online dictionary defines the root word, chill, as "to make cold or chilly." Merriam-Webster Dictionaries, https://www.merriam-webster.com/dictionary/chill (accessed January 4, 2022). A common definition of "equipment" is "the set of articles or physical resources serving to equip a person or thing: such as (1) the implements used in an operation or activity, (2) all the fixed assets other than land and buildings of a business enterprise." Merriam-Webster Dictionaries, https://www.merriam-webster.com/dictionary/equipment (accessed January 4, 2022). Although not a word to be directly interpreted as it is not specifically stated anywhere in the Agreement, it is interesting to note that the dictionary defines "refrigerant" as "a refrigerant agent or agency: such as a substance used in refrigeration." https://www.merriam-webster.com/dictionary/refrigerant (accessed January 4, 2022). Although the parties and the trial court resorted to extrinsic evidence

to assist in defining the phrase, we note it would certainly be possible to conclude, based on the plain, ordinary usage of the words, that chilling equipment is defined as a set of articles or physical resources serving to equip a thing, including all fixed assets other than land and buildings, in order to make it cold or chilly.  Under that definition, it appears reasonable to conclude that refrigerant is encompassed by the term "chilling equipment" in the Agreement when utilizing the plain, ordinary usage of the words.  However, such an analysis is not entirely straightforward, as the dictionary definitions do not specifically and directly lead to the inescapable conclusion that refrigerant is chilling equipment. Thus, it is apparent that deciphering the meaning of the words "chilling equipment" in the contract provision leads to the conclusion they are "reasonably susceptible of more than one meaning" and are ambiguous.  *Lightning Rod. Mut. Ins. Co. v. Southworth,* 151 Ohio St.3d 70, 2017-Ohio-7438, 86 N.E.2d 274, ¶ 12.

**{¶28}** Interestingly, both parties assert, and the trial court concluded, that the language of the contract is unambiguous.  However, both parties and the trial court made ample use of extrinsic evidence in order to clarify this supposedly unambiguous term, directly contrary to the principles of contract construction.  *Inland Refuse,* at 322.  In its judgment entry the trial court also states the term "chilling equipment" cannot "be reasonably construed" to include the refrigerant.  (12/9/20 J.E., p. 11.)  However, a determination as to the reasonableness of a term is only undertaken when the intent of the parties becomes a question of fact in an ambiguous contract.  *Inland Refuse,* at 322. The judgment entry is replete with extrinsic factual evidence cited by the court regarding the parties' negotiations and intent.  This clearly shows that, despite its stated determination as a matter of law that the contract was unambiguous, the court actually

found the language to be ambiguous and was required to consider extrinsic evidence to reach its conclusion. Because the trial court employed extrinsic evidence to reach its conclusion based on reasonableness, the trial court did find the term "chilling equipment" was ambiguous, despite its misuse of the word "unambiguous" in the judgment entry. Thus, the trial court made a factual determination which in most circumstances precludes summary judgment. However, if there are undisputed facts in the record on which the trial court relied in order to determine the issue as a matter of law and the trial court was not forced to weigh competing evidence, the trial court's decision may still be correct. Hence, we must examine the record in order to determine whether there are issues of material fact in question, preventing the trial court from interpreting this ambiguous term as a matter of law.

{¶29} In the judgment entry, the trial court captioned one section as "Relevant Factual Background." The entry begins by discussing the 2015 lease agreement and refers to the fact that the lease provided Appellant with the option to purchase only the real estate and not any personal property or fixtures. However, the 2015 lease is irrelevant to this matter. The lease agreement was an entirely separate contract between the parties. The only relevance of the lease to this case is that it provided Appellant the option to purchase, which it exercised. Once Appellees were formally notified of Appellant's intent to exercise the purchase option, new negotiations began relative to the purchase Agreement. Further, the Agreement contains an integration clause, clearly making any intent or understanding by the parties under the lease agreement irrelevant. It is undisputed that the relevant Agreement ultimately provided that Appellant would purchase fixtures and other intangibles beyond purchase of the Property, such as the

lengthy list of existing ice rink rental contracts. Under the principles of contract construction, the extrinsic evidence to be considered by the court when interpreting an ambiguous contract is the evidence concerning the circumstances and objectives of the parties at the time the contract was executed, and not evidence regarding prior irrelevant contracts between the parties. *Oryann, Ltd.* at ¶ 26.

{¶30} According to the record and the testimony of Appellant's employee Jesse MacGregor ("MacGregor"), counsel for Appellant submitted a first draft of the Agreement in October of 2017. At that time the relevant provision provided:

> AGREEMENT TO SELL. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase and take from Seller, the property located at 360 McClurg Rd., Boardman, Ohio 44512, as more particularly described on Exhibit A attached hereto and by this referenced incorporated herein, together with all privileges, entitlements, easements, rights, appurtances and improvements thereto (individually, the "Property").

(MacGregor Depo., Exh. 7.)

{¶31} The final sentence regarding fixtures was not present in the first draft. In the second draft sent by Appellant's counsel on November 7, 2017, the single word "fixtures" was added to read: "Seller agrees to sell and convey * * * the [P]roperty * * * together with all fixtures, privileges, entitlements, easements, rights, appurtenances and improvements thereto." (MacGregor Depo., Exh. 9.)

{¶32} Appellant's counsel emailed a third draft of the Agreement to Appellees' counsel on November 15, 2017. In this draft the final sentence of Section 1 appears:

"For purposes of this Agreement 'fixtures' includes all items permanently attached to the building, including but not limited to, ice rink boards, scoreboard, bleachers, chilling equipment and lockers." (MacGregor Depo., Exh. 10.) This is the final version and the sentence at the heart of the dispute in this matter.

{¶33} There is evidence in the record that between November and late December of 2017 the parties also engaged in side negotiations regarding a proposed purchase by Appellant of additional personal assets owned by Ice Zone, with Ice Realty acting as the agent for Ice Zone. According to exhibits 12 and 13 to the MacGregor deposition (emails between parties' counsel), Appellees offered additional personal property, not included in the Agreement, consisting of one Zamboni machine and all of the rental ice skates, in exchange for additional monetary consideration and six months of rent-free leasing by Appellee Ice Zone. There was also a proposal that the Ice Zone operator should continue to operate the ice facility for a time. This was purportedly designed to assist Appellant in transitioning into the ice rink business. According to the record, the parties were not able to reach an agreement on this additional personal property or operator and they were not included in the Agreement. Importantly, nowhere in the record was there a list of any other personal property Appellees offered to include at that time. Particularly, there is no mention of refrigerant. Refrigerant is never raised in any communications between the parties during negotiations for the real estate purchase or during the separate negotiations for the potential purchase of personal assets. It was not offered as an asset by Ice Zone or included in the later list of items, such as Zambonis and ice skates. According to Appellant counsel's testimony, "[t]he basis of [the offer] refusal was that

seemed like a lot of money for Zambonies and skates, which we considered to be what that was contemplating." (Fortunato Depo., p. 69).

**{¶34}** As noted, Appellant closed on the purchase of the Property on December 29, 2017. Prior to the closing, Appellees removed property from the building, including their two-day removal of the refrigerant from the building by a third-party contractor. According to the deposition testimony of James Fleeger, employee for Appellee Ice Zone who was in charge of securing a contractor to remove the refrigerant, he did not himself believe the refrigerant was personal property but maintained it was an "asset of the building." (Fleeger, Depo., p. 68.) Moreover, according to Appellant counsel's testimony, on the day the personal property was removed, Appellant and counsel were at the Property and a man identified by Fleeger as Vice President of Phantom Fireworks was:

> walking around with a baseball bat tapping it on the floor, not allowing people to walk down hallways, standing in the hallway with a bat, very much intimidating not only our employees, his own employees, along with the youth organizations that were in the building at the time witnessing the situation.

(MacGregor Depo., p. 32.) Also of note, both MacGregor and Fortunato testified in their depositions that a Phantom Fireworks employee warned them not to start the Ice Pro System because it would explode without refrigerant. (Fortunato Depo., p. 68; MacGregor Depo., pp. 23-24).

**{¶35}** In its judgment entry the trial court concluded that, as a matter of law, refrigerant is not encompassed by the term "chilling equipment." It concluded:

As a matter of law, the refrigerant is personal property with its own discrete identity because it fits within the Ohio Supreme Court's definition of "personal property": a "movable or intangible thing that is subject to ownership and not classified as real property." *Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.,* 145 Ohio St. 3d 29, 2015-Ohio-3716, ¶ 22 fn. 6. [Appellant's] designee admitted that the refrigerant satisfies these criteria, J. MacGregor Dep. 11:15-21, 12:21-23, 13:15-20. Thus, as a matter of law, this Court holds that the unambiguous term "chilling equipment" does not encompass the refrigerant and, therefore, [Appellees] did not breach the Purchase Agreement by removing the discrete refrigerant from the chilling equipment.

(12/9/20 J.E., p. 11.)

**{¶36}** In support of its decision, the trial court relied on three sources. First, the trial court concluded its holding was analogous to the federal decision in *Libbey, Inc. v. Factory Mut. Ins. Co.,* No. 3:06-CV-2412, 2007 WL 9757792, at *3 (N.D. Ohio June 21, 2007), which held that oil used in a machine never becomes part of the machine even if it is essential to its operation because an essential material is not analogous to an actual part of the machine. *Id.* Appellees also cited to *Libbey* in their motion for summary judgment. In *Libbey,* a company sought coverage under an all-risk policy for damage to its glass blowing machine as a result of a defective lubricating oil. The insurance company denied coverage based on a policy exclusion that excluded coverage for "faulty workmanship, material, construction or design from any cause." *Id.* at *2. In a somewhat circular and confusing fashion, the district court held that lubricating oil is not a "material"

under the ordinary and natural meaning and, therefore, the loss is not excluded under the "faulty material" exclusion. *Id.* at *3. The court looked to the definition of "materials" and determined it meant the elements or substances that composed the machinery at issue. Simply holding, without apparent authority, that oil always retains its own identity, the court determined that it was not a material that "made up" the machine despite being essential to its operation. As it was not "material" to the glassblowing machine, it did not encompass a material excluded from coverage.

**{¶37}** Citing to various treaties on thermodynamics, Appellant contends that the oil at issue in *Libbey* is not analogous to the refrigerant here because the glass blowing machine in *Libbey* was an "open system" and the Ice Pro System is a "closed system". The distinction being, according to Appellant, that the internal mass or fluid in an open system changes its properties over time, as opposed to the fluid in a closed system, which remains constant. (Appellant's Brf., p. 29.) Appellees argue that whether it is an open or closed system is irrelevant to the holding in *Libbey*, which recognizes that any substance added internally to a machine to operate it is fundamentally different from the machine itself. While we may be persuaded that there is a distinction between an open and closed system, we conclude that *Libbey* is not controlling authority and the holding in *Libbey* is not directly analogous. The district court in *Libbey* determined that the policy language was unambiguous and, thus, interpreted the meaning of "material" as it related to the language in the insurance policy to determine that the language which specifically excluded coverage for "material," excluded the oil as a matter of law. Again, we must note that the trial court came to its conclusion as to the nature of oil, in general, absent any authority.

Case No. 21 MA 0001

**{¶38}** The second source cited by the trial court in support of its decision is a Missouri tax letter that concluded oil and antifreeze in a motor vehicle are personal property because they do not have "a degree of permanence and durability to [a] motor vehicle" but instead are tangible personal property that can be separated from the machinery or equipment and be replaced. *Motor Oil and Antifreeze Are Not Parts,* 2018 Mo. Tax. Ltr. Rul. LEXIS 41, *1. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exh. D.) Appellant again argues that motor oil and antifreeze operate in an open system and change properties over time whereas the refrigerant remains stable within the closed system in which it flows. Appellees do not address the Missouri tax letter in their brief. The tax letter from the Missouri Department of Revenue is certainly not controlling authority. The facts of the case are not analogous to the case at issue here, as Appellants point out. Importantly, the matter involved interpretation of Missouri tax codes, and not the intent of the parties to a contract.

**{¶39}** The third source relied on by the trial court is a case from a New York appellate court which held that paper filters added to a machine do not constitute part of the machine itself. *Fredonia Prods. Co. v. Procaccino,* 53 A.D.2d 275 (N.Y. App. Div. 1976). In *Fredonia,* the appellate court was charged with reviewing the determination of the New York State Tax Commission that sheet pulp, known as filter paper and used for processing grape juice, was not equipment, but constituted "supplies used in connection with…machinery, equipment or apparatus" and, hence, was subject to sales tax. *Id.* at *275. Similar to *Libbey,* the *Fredonia* court concluded, after reviewing the record, that the paper was used during various stages of producing grape juice to assist in the operation of various pieces of equipment but was not itself equipment because it did not "operat[e]

independently within petitioner's production chain." *Id.* at *277. Neither party addresses the *Fredonia* case in their appellate briefs. However, it is apparent, beyond recognizing that the facts are not analogous, the New York court's interpretation of New York state tax code requires a completely different analysis than the interpretation of contract under Ohio law and using Ohio's principles of contract construction. Here, we must consider the intent of the parties to this contract, rather than the intent of the New York legislature in enacting the New York tax code.

**{¶40}** After considering these three sources in support of its determination, the trial court stated, "[t]he Court has not located any contrary legal authority in Ohio or elsewhere, and KSMAC has cited none." (12/9/20 J.E., p. 11.) However, both in its motion in opposition to summary judgment and on appeal, Appellant relies on a Texas bankruptcy case in support of its argument that the refrigerant is part of the chilling equipment. *In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118 (Bkrtcy.N.D.Tex 2003). In *San Angelo*, a bankruptcy debtor sought to recover for the city's retention of certain items that were either affixed to, or present in, a leased municipal stadium after termination of the debtor's lease. The bankruptcy court had ordered that the debtor was to retain its personal property and trade fixtures. *Id.* at 129. The court undertook an analysis of items of property leading to the dispute by the parties. The items included, for purposes of this matter, glycol, which is the liquid refrigerant that flowed through the pipes under an ice rink floor. The court determined the following:

> The evidence established that many gallons of Glycol flow through the pipes
>
> under the ice floor. The Glycol is cooled by the ice plant to temperatures
>
> below freezing. Whether in use or not in use, the Glycol rests in the pipes

Case No. 21 MA 0001

under the ice floor; the ice plant merely circulates and cools the Glycol. While it is uncontested that the Glycol may be removed from the pipes by blowing compressed air through one end of the pipes and collecting the Glycol in barrels at the other end, it is illogical to argue that the Glycol is personalty or a trade fixture. The Glycol is an integral component part of the ice floor which, as previously noted, is an improvement.

The ice floor is composed of more than its two-dimensional surface. It consists of the surface, the concrete, the piping and the Glycol. Removing the Glycol from the ice floor renders the ice floor inoperable, and no longer an ice floor. * * * Similarly, when the parties contemplated the idea of an ice floor, they necessarily included within that idea not only such items as concrete and pipes, but also coolant. This argument can be taken to extremes: if the Glycol is an integral part of the ice floor, then why aren't the ice resurfacers integral parts of the ice floor, since the ice floor requires both to function as an ice floor? The difference, however, is that the Glycol rests in the ice floor. The Glycol is an internal part of an improvement, as opposed to some external part on which such improvement relies. The Glycol, therefore, is not a trade fixture or an item of personalty.

*San Angelo,* at 131.

{¶41} The *San Angelo* case appears to present the single instance where a court was faced with the determination of whether liquid refrigerant in an ice rink floor is a fixture. It is unclear why the trial court in this matter chose to completely ignore *San*

*Angelo* in making its determination. We recognize *San Angelo* is also not completely analogous, as the court was not interpreting contract language, but enforcing the bankruptcy judgment entry stating the debtor was entitled to retain its "personal property and trade fixtures." *Id.* at 129. However, the *San Angelo* holding utilizes the logic that the refrigerant is a fixture based on its physical location and function as integral to the improvement to the property. Similar to the instant matter, the refrigerant was contained in pipes under the flooring as part of a permanently installed ice rink cooling system. The Texas court addressed the same argument made by Appellees here, that the refrigerant could be removed from the Ice Pro System. Appellees argue that, by definition, this makes it personalty. The *San Angelo* court was not persuaded by this identical argument, partially reasoning that the removal of the refrigerant was not typical and required an effort not normally required in removing personal property. This fact is evident in the present case, since Appellees were required to hire a third-party reclamation contractor and it took two days to remove the refrigerant. The Texas case, while not on all fours with the current matter, appears closely analogous in that the refrigerant at issue in this case was made a part of the ice flooring, remained within the system, and was not easily removable: all characteristics of a fixture rather than personalty.

{¶42} The trial court also completely disregarded the sole expert testimony presented by Appellant from Christos Geatrakas ("Geatrakas"). For approximately 35 years, Geatrakas had been the owner and partner of CW Davis, the company that designed, built, installed, and maintained the Ice Pro System in question. Geatrakas testified, *inter alia,* that:

[COUNSEL]  What is the only component in this entire system that has chilling qualities?

[GEATRAKAS]  The refrigerant and the changing of state of the refrigerant, based on every piece of the system together, compressors, condensers, the storage vessel.  Everything together they marry up to allow the refrigerant to transfer the heat and do the chilling.

* * *

[COUNSEL]  Without the refrigerant, the freon was removed, did the buyers acquire chilling equipment?

* * *

[GEATRAKAS]  They bought components, minus the refrigerant, that could not chill without the refrigerant.

* * *

[GEATRAKAS]  One thing I should add, could add, would like to add:  The R-22 was a refrigerant that the entire system was designed around.  If one were to want to substitute the R-22 with something else, the system will not operate as efficiently, may not even operate at all.  So that's -- the system, the components, the -- that thing that makes up the ice rink and making it cold is designed around the R-22.

Case No. 21 MA 0001

\* \* \*

[GEATRAKAS] Refrigerant itself is -- it's the -- it would be an element. It would be a part. It would be a piece. Without it, the rest of the parts and pieces are just parts and pieces. It could sit on your desk and do absolutely nothing by themselves without the R-22.

(Geatrakas Depo., pp. 138-139; 64-65; 69-70.)

{¶43} Again, Appellees maintain that the contract language is unambiguous and, as such, the expert testimony is inadmissible. The trial court did not refer to the uncontroverted expert testimony in its judgment entry. However, as previously discussed, despite claiming the contract is unambiguous, the trial court was forced to rely on extrinsic evidence in support of its position, although in a highly selective fashion.

{¶44} When reviewing ambiguous contract language, a court is permitted to consider extrinsic evidence, including a review of any negotiations that occurred between the parties as well as the circumstances surrounding the parties at the time the contract was entered to clarify what the parties intended. In this case, the court needed to determine what was intended by the term "chilling equipment" in the parties' Agreement.

{¶45} A review of the entire record including depositions, emails, correspondence and other evidence of negotiations between the parties during the drafting of the Agreement, as well as other evidence submitted by the parties, reveals the following: first, the parties may have originally contemplated only a real estate purchase. However, the final Agreement includes "fixtures" that the Agreement defines as "all items permanently attached to the building, including but not limited to, ice rink boards,

scoreboard, bleachers, chilling equipment, and lockers." Second, there is evidence in the record that the parties clearly intended to sell a fully operational ice rink. It is not disputed that Appellant purchased a multitude of ongoing ice rink rental agreements, attached by exhibit to the Agreement, along with the property and fixtures. In addition, Appellant submitted the sole expert testimony from Geatrakas, owner of the company that designed, built, installed and maintained the Ice Pro System in question. Geatrakas testified that the refrigerant was not just a component of the system but was the only thing that served to chill the chilling equipment. Appellees did not present any rebuttal testimony or expert opinion to contradict Geatrakas' opinion testimony. In addition, Appellees do not dispute that the parties had also been engaged in separate negotiations for the possible purchase of specific Ice Zone personal property (Zambonis and rental skates) in exchange for payment. Apparently also at issue was the opportunity for the then-current ice rink operator to continue in his capacity for a period of six months after closing. Appellant argues that its refusal to keep the existing ice rink operator led to animosity between the parties and instigated Appellees' decision to remove, or permit removal of, the refrigerant. There is deposition testimony that may support this contention. Regardless, if Appellees' actions lead to the conclusion that they understood operation of the ice rink was vital to the purchase of the Property, then logically it was necessary for the ice rink to be operational, which would require refrigerant. There is undisputed evidence that the parties intended to transfer an operational ice rink rather than a melted floor. The record reveals that it was only after the side negotiations fell through that Appellees elected to remove, or permit removal of, the refrigerant from the Property. There was also testimony that Appellees' employees purposely shielded

Case No. 21 MA 0001

removal of the refrigerant by denying Appellant's employees access to the area on the day the parties agreed to meet for the removal of personalty from the Property. After closing, the ice floor began to melt and one of Appellees' employees warned Appellant not to operate the system because it would "blow up" without the refrigerant. (MacGregor Depo., p. 23.) When Appellant confronted Appellee Ice Zone about the melting floor and removal of the refrigerant, Appellee Ice Zone offered to sell the refrigerant back to Appellant in order for Appellant to be able to operate the equipment.

{¶46} Based on the foregoing, it appears that the trial court's decision was entirely based on weighing the material facts in this case instead of on a clear question of law. The intent of the parties lies at the heart of this ambiguous contract. It is clear that genuine issues of material fact exist in this matter and reasonable minds may come to more than one conclusion regarding the intent of the parties in conveying "chilling equipment" under the Agreement. Where material issues of fact remain in dispute, summary judgment is not appropriate. *ABL, Inc. v. CTW Dev. Corp.*, 7th Dist. Mahoning No. 15 MA 20, 2016-Ohio-759, ¶ 35.

{¶47} The trial court erred in determining that as a matter of law "chilling equipment" does not include its refrigerant. This issue does not involve an agreement on all necessary facts and simple application of the relevant law to those facts. The court's utilization of certain extrinsic evidence and in weighing the facts in this matter precluded summary judgment. Appellant's first assignment has merit and is sustained.

{¶48} As Appellant has met its burden in demonstrating that issues of material fact remain for trial in this case and that summary judgment was improper, Appellant's

first and second assignments of error have merit and are sustained as to Appellee Ice Realty only.

ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AS TO THE FRAUD AND CONVERSION CLAIMS.

**{¶49}** Appellant contends that the refrigerant is a fixture. As such, the trial court erred in granting summary judgment to Appellees on Appellant's claims for fraud and conversion. Again, although Appellant raised a number of claims against Appellees in its complaint on appeal, it challenges the trial court's determination only as to breach of contract and the claims of conversion and fraud.

**{¶50}** In the preceding assignments we have determined the trial court erred in granting summary judgment to Appellees on the breach of contract claims. Regarding fraud and conversion, Appellees maintain that summary judgment was proper because: (1) the refrigerant is personal property and since Appellant did not own the refrigerant there can be no conversion; (2) Appellant is precluded from asserting claims of fraud and conversion based on the same underlying actions as the breach of contract claim; (3) Appellant failed to present evidence that Appellees made any misrepresentations regarding the refrigerant and also failed to present evidence that Appellant justifiably relied on any misrepresentations; and (4) the doctrine of economic loss bars the conversion and fraud claims.

Case No. 21 MA 0001

**{¶51}** In order to prevail on a claim of fraud, a plaintiff must demonstrate all of the elements:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the misrepresentation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984).

**{¶52}** Appellant alleges fraud, claiming Appellees misrepresented that Appellant would receive all of the chilling equipment or, in the alternative, that Appellees had a duty to disclose that they were going to remove or allow removal of the refrigerant. Appellant further argues that Appellee Zoldan's removal of the refrigerant was a malicious act intended to punish Appellant for refusing to allow him to continue to control operation of the ice rink for an additional six months. In support, Appellant relied on the testimony of Fortunato, who testified Zoldan believed that Appellant was forcing him out of the Ice Zone and embarrassing him in the hockey community. (Fortunato Depo., pp. 62-63.)

Case No. 21 MA 0001

Appellant also asserts that counsel for Appellees warned counsel for Appellant about this alleged ill will and that retaliation may occur.  (Fortunato Depo., pp. 61-62.)  Appellant contends that only as a result of being denied the opportunity to continue to operate the rink did Zoldan decide to characterize the refrigerant as personal property and have it removed from the premises.

{¶53}  Appellant also claims Appellees converted the refrigerant.  The elements of conversion are:  (1) the plaintiff's ownership or right to possession of property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.  *Manshadi v. Bleggi,* 2019-Ohio-1228, 134 N.E.3d 695, ¶ 35 (7th Dist.).  Appellant points out that when it exercised the option to purchase, it was bound by the terms of the Agreement.  Relying on the entirety of the parties' Agreement, the Agreement specifically stated Appellant was purchasing chilling equipment and that one of the terms of the agreement required Appellant to honor the existing ice rink rental contracts.  Appellant's position is that the contract taken as a whole constituted a promise by Appellees that Appellant would receive a frozen ice rink and Appellant relied on that promise to its detriment.  In addition, Appellant asserts that as it relied on a frozen and operational ice rink, Appellees had a duty to disclose the removal of the refrigerant.  Instead, Appellees purposefully concealed the fact that the refrigerant was being removed.

{¶54} In granting summary judgment to Appellees, the trial court again adopted the language presented by Appellees almost verbatim and concluded the following as it pertains to the fraud and conversion claims:  (1) the economic loss doctrine precluded Appellant's claims for conversion and fraud; (2) the fraud and conversion claims were

precluded because they were improper recapitulations of the breach of contract claim; and (3) the fraud claim fails because it is legally impossible for Appellees to steal their own property.

**{¶55}** Under the economic loss doctrine, "a party cannot recover purely economic damages in a tort action against another party based upon the breach of contractually created duties." *B&H Resources, L.L.C. v. 28925 Lorain Inc.,* 8th Dist. Cuyahoga No. 105323, 2017-Ohio-7248, ¶ 16. A review of the record reveals the only damages sought by Appellant is the economic loss associated with the purchase of additional refrigerant. Although Appellant mentioned possible damage to the Ice Pro System from a lack of refrigerant, no evidence of damage or loss of equipment was presented.

**{¶56}** The law in Ohio is that a breach of contract claim does not create a tort claim. *Netherlands Ins. Co. v. BSHM Architects, Inc.,* 111 N.E.3d 1229, 2018-Ohio-3736, ¶ 27 (7th Dist.). A tort claim founded on the same underlying conduct as a contractual claim is precluded unless the defendant also breached a duty that was owed independently of the contractual duties. *Id.* Appellant is not alleging any independent duty owed by Appellee Ice Realty other than those duties owed under the contract.

**{¶57}** Regarding claims that may exist against the other Appellees, as noted, the breach of contract action can only be asserted against Appellee Ice Realty, the only other party to the contract. The economic loss doctrine and any attempt to recharacterize breach of contract claims as tort claims apply to prohibit suit against the remaining Appellees. A review of the record reveals Appellant presented very limited evidence in support of its tort claims against the other Appellees in this action. Deposition testimony of MacGregor alleging Zoldan maintained some animus against Appellant is the only

evidence in support of these claims. As Appellees correctly note, Appellant's counsel testified at his deposition that it was assumed the equipment would be left in working order, but no representative of Appellee expressly stated the equipment would be fully functional. (MacGregor Depo., pp. 187, 195.) Based on the record before us, Appellant has not established that there was a justifiable reliance on any specific misrepresentations made by the remaining Appellees.

{¶58} As to Appellant's conversion claim, we have concluded that the trial court erred in granting summary judgment on Appellant's breach of contract claim because genuine issues of material fact exist regarding the meaning of "chilling equipment" in the Agreement. Again, any tort claim, such as a claim for conversion, against Appellee Ice Realty is precluded by the existing breach of contract claim. *Netherlands,* at ¶ 27. An actionable tort claim against the other Appellees exists only where Appellant can demonstrate that those Appellees owed an independent duty to Appellant. *Id.* Appellant has made no such showing, here. No evidence has been introduced that there was an existing duty owed Appellant by any other Appellee (beyond Ice Realty), hence, no viable claim for conversion appears to exist.

{¶59} In its judgment entry, the trial court took a somewhat broad approach and granted summary judgment in favor of all Appellees on Appellant's fraud and conversion claims for several reasons. The trial court concluded the claims were precluded against all Appellees by the economic loss doctrine; as improper recharacterization of the breach of contract claim; and because Appellees could not "steal" their own property. The trial court included all Appellees in its determination. However, as noted, *supra,* the discussion of the economic loss doctrine and improper recharacterization applies to Ice

Realty because the breach of contract claim applies to Ice Realty. Therefore, summary judgment on the fraud and conversion claims in favor of Appellee Ice Realty is affirmed based on Appellant's breach of contract claims. Regarding the remaining Appellees, the torts of fraud and conversion are only applicable if Appellant had demonstrated that they owed some separate duty to Appellant outside of the Agreement at issue. Appellant has not made such a showing. Appellant provided no evidence of reliance or any misrepresentations by these Appellees. Further, as the breach of contract claim seeks economic damages against Appellee Ice Zone Realty, it is precluded from seeking the same damages based on the same set of facts in a tort action. No additional evidence of damage beyond the damage caused by the breach was offered. Hence, the trial court was correct in its conclusion on these claims, but not totally accurate in the manner in which it reached its conclusion.

{¶60} In reviewing this record, the trial court did not err in granting summary judgment in favor of Appellees on Appellant's fraud and conversion claims, but for other reasons. Appellant's third assignment of error is without merit and is overruled.

{¶61} Based on the foregoing, the judgment of the trial court is reversed as to the first and second assignments of error regarding summary judgment on Appellant's breach of contract claim only as to Appellee Ice Realty. It is clear that questions of material fact remain for trial in this matter. The remainder of the trial court's judgment is affirmed. The matter is remanded to the trial court for further proceedings according to law.

Donofrio, P.J., concurs.

D'Apolito, J., concurs.

Case No. 21 MA 0001

[Cite as *KSMAC Holdings, Ltd. v. Ice Zone Realty, Ltd.*, 2022-Ohio-1456.]

---

For the reasons stated in the Opinion rendered herein, Appellant's first and second assignments of error are sustained as it relates to Appellee Ice Realty, and its third assignment is overruled. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed in part and reversed in part. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellee Ice Realty.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**